**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT PIKEVILLE**

| | |
|---|---|
| ARNETIA JOYCE ROBINSON, | |
| Plaintiff, | |
| vs. | No. 7:15-cv-109-ART |
| THE FEDERAL HOUSING FINANCE AGENCY, in its capacity as Conservator of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, MELVIN L. WATT, in his official capacity as Director of the Federal Housing Finance Agency, and THE DEPARTMENT OF THE TREASURY, | **PLAINTIFF'S AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **FILED UNDER SEAL** |
| Defendants. | |

Plaintiff Arnetia Joyce Robinson ("Plaintiff"), by and through her undersigned counsel, hereby alleges as follows:

**I.
INTRODUCTION**

1.      In August 2012, at a time when the housing market was recovering from the financial crisis and the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (respectively, "Fannie" and "Freddie," and, together, the "Companies") had returned to stable profitability, the federal government took for itself the entire value of the rights held by Plaintiff and Fannie's and Freddie's other private shareholders by forcing these private, shareholder-owned Companies to turn over **all** of their profits to the federal government on a quarterly basis **forever**—an action the government called the "Net Worth Sweep" that nationalizes private shareholders' investment in the Companies. Plaintiff brings this action to put

1

a stop to the federal government's naked, unauthorized, and ongoing expropriation of private property rights.

2.     Fannie and Freddie are two of the largest privately owned insurance companies in the world. They insure trillions of dollars of mortgages and provide essential liquidity to the residential mortgage market. The Companies operate for profit, and their debt and equity securities are privately owned and publicly traded. The Companies' shareholders include community banks, charitable foundations, mutual funds, insurance companies, pension funds, and countless individuals, including Plaintiff.

3.     Throughout the financial crisis, Fannie and Freddie were capable of meeting all of their obligations to insureds and creditors and were capable of absorbing any losses that they might reasonably incur as a result of the downturn in the financial markets. As mortgage insurers, Fannie and Freddie are designed to generate ample cash to cover their operating expenses—and indeed this was the case for the Companies throughout the financial crisis. In contrast to the nation's largest banks, the Companies took a relatively conservative approach to investing in mortgages during the national run up in home prices from 2004 to 2007. As a result, the Companies (i) experienced substantially lower mark-to-market credit losses during the financial crisis than other mortgage insurers, (ii) were never in financial distress, and (iii) remained in a comparatively strong financial condition. Indeed, the Companies' ability to pay any outstanding claims—a fundamental principle for all insurers—was never in doubt. Despite the Companies' relative financial health, the Department of the Treasury ("Treasury") implemented a deliberate strategy to seize the Companies and operate them for the exclusive benefit of the federal government.

Protected Information to Be Disclosed Only in Accordance With Protective Order

4.      At Treasury's urging, in July 2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"). HERA created the Federal Housing Finance Agency ("FHFA") (Treasury and FHFA are sometimes collectively referred to herein as the "Agencies") to replace Fannie's and Freddie's prior regulator and authorized FHFA to appoint itself as conservator or receiver of the Companies in certain statutorily specified circumstances. As conservator, HERA charges FHFA to rehabilitate Fannie and Freddie by taking action to put the Companies in a sound and solvent condition while preserving and conserving their assets. Only as receiver does HERA authorize FHFA to wind up the affairs of Fannie and Freddie and liquidate them. HERA's distinctions between the authorities granted to conservators and receivers are consistent with longstanding laws and practices of financial regulation.

5.      HERA also granted Treasury temporary authority to invest in the Companies' stock until December 31, 2009. Congress made clear that in exercising this authority Treasury was required to consider the need for Fannie and Freddie to remain private, shareholder-owned companies.

6.      These limitations on FHFA's and Treasury's authority make clear that Congress did not intend for the Agencies to operate Fannie and Freddie in perpetuity, and certainly not for the exclusive financial benefit of the federal government.

7.      On September 6, 2008—despite both Agencies' prior public statements assuring investors that the Companies were in sound financial shape—FHFA, at Treasury's urging, abruptly forced Fannie and Freddie into conservatorship. Under HERA, and as acknowledged by FHFA at the time, the purpose of the conservatorship was to restore confidence in and stabilize the Companies with the objective of returning them to normal business operations. As FHFA confirmed in its public statements, conservatorship is necessarily temporary, and FHFA may

Protected Information to Be Disclosed Only in Accordance With Protective Order

only act as conservator for the Companies until they are stabilized. At the time, neither of the
Companies was experiencing a liquidity crisis, nor did they suffer from a short-term fall in
operating revenue. Moreover, the Companies had access to separate credit facilities at the
Federal Reserve and at the Treasury, and the Companies held hundreds of billions of dollars in
unencumbered assets that could be pledged as collateral if necessary. Nevertheless, Treasury
instead coerced the Companies into conservatorship to further the government's unspoken policy
objectives. Indeed, a receivership that sold all of the Companies' assets and liabilities would
have more economic value to the private shareholders than the conservatorship as it was
structured and operated in practice. And in any event, Treasury had definitively concluded that
the Companies would not be placed into receivership at that time.

8.      Immediately after the Companies were forced into conservatorship, Treasury
exercised its temporary authority under HERA to enter into agreements with FHFA to purchase
securities of Fannie and Freddie ("Preferred Stock Purchase Agreements" or "PSPAs"). Under
these PSPAs, Treasury committed to purchase a newly created class of securities in the
Companies, known as Senior Preferred Stock ("Government Stock"). In return for its
commitment to purchase Government Stock, Treasury received $1 billion of Government Stock
in each Company and warrants to acquire 79.9% of the common stock of the Companies at a
nominal price.

9.      The Government Stock entitled Treasury to dividends at an annualized rate of
10% if paid in cash or 12% if paid in kind. The Government Stock was entitled to receive cash
dividends from the Companies only to the extent declared by the Board of Directors "in its sole
discretion, from funds legally available therefor." If the Companies did not wish to—or legally
could not—pay a cash dividend, the unpaid dividends on the Government Stock could be

4

capitalized (or paid "in kind") by increasing the liquidation preference of the outstanding Government Stock—an option Treasury publicly enunciated in the fact sheet it released upon entry into the PSPAs. Therefore, the Companies were *never* required to pay cash dividends on Government Stock. There was *never* any threat that the Companies would become insolvent by virtue of making cash dividend payments, both because dividends could be paid with stock and because state law prohibits the payment of dividends if it would render a company insolvent. Indeed, unlike most preferred stock that imposes temporal limits on a company's ability to exercise a payment in kind option, the PSPAs specifically allowed the Companies to utilize this mechanism throughout the life of the agreement, thereby foreclosing any possibility that they would exhaust Treasury's funding commitment because of a need to make a dividend payment to Treasury.

10.     The Government Stock diluted, but did not eliminate, the economic interests of the Companies' private shareholders. The warrants to purchase 79.9% of the Companies' common stock gave Treasury "upside" via economic participation in the Companies' profitability, but this upside would be *shared* with private common shareholders (who retained rights to 20.1% of the Companies' residual value). James Lockhart, the Director of FHFA, accordingly assured Congress shortly after imposition of the conservatorship that Fannie's and Freddie's "shareholders are still in place . . . common shareholders have an economic interest in the companies" and that "going forward there may be some value" in that interest.

11.     Under FHFA's supervision—and, on information and belief, at the insistence and direction of Treasury—the Companies were forced to excessively write down the value of their assets, primarily due to FHFA's wildly pessimistic assumptions about potential future losses. Despite the Companies' concerns, FHFA caused the Companies to incur substantial non-cash

Protected Information to Be Disclosed Only in Accordance With Protective Order

accounting losses in the form of loan loss provisions. To be clear, tens of billions of dollars of these provisions—recognized by the Companies as expenses—were completely unnecessary since the potential loan losses never materialized into actual losses. Nonetheless, by June 2012, the Agencies had forced Fannie and Freddie to issue $161 billion in Government Stock to make up for the balance-sheet deficits caused by the Agencies' unrealistic and overly pessimistic accounting decisions, even though there was no indication that the Companies' actual cash expenses could not be met by their cash receipts. The Companies were further forced to issue an additional $26 billion of Government Stock so that Fannie and Freddie would be able to pay *cash* dividends to Treasury even though, as explained above, the Companies were never required to pay cash dividends. Finally, because (i) the Companies were forced to issue Government Stock to Treasury that they did not need to continue operations and (ii) the structure of Treasury's financial support did not permit the Companies to repay and redeem the Government Stock outstanding, the amount of the dividends owed on the Government Stock was artificially—and permanently—inflated.

12.    As a result of these transactions, Treasury amassed a total of $189 billion in Government Stock. But based on the Companies' performance in the second quarter of 2012, it was apparent that there was still value in the Companies' private shares. Treasury's attempt to drown the Companies' other shareholders by extending to the Companies a *concrete* "life preserver" had failed. By that time, the Companies were thriving and paying 10% annualized cash dividends on the Government Stock without drawing additional capital from Treasury. And based on the improving housing market and the high quality of the newer loans backed by the Companies, it was apparent that they had returned to stable profitability. The Agencies had specific information from the Companies demonstrating that this return to profitability was

Protected Information to Be Disclosed Only in Accordance With Protective Order

inevitable because the Companies would soon be reversing many of the non-cash accounting losses they had incurred under FHFA's supervision. In light of that information and the broad-based recovery in the housing industry that had occurred by the middle of 2012, the Agencies fully understood that the Companies were on the precipice of generating huge profits, far in excess of the dividends owed on the Government Stock. Moreover, when the Net Worth Sweep was suddenly imposed on the Companies in August 2012, the financial crisis had clearly passed and there was absolutely no need for "drastic emergency action" by the Agencies.

13.     Treasury, however, was not content to share the value of the Companies with private shareholders and was committed to ensuring that the Companies were operated for the exclusive benefit of the federal government. Indeed, unbeknownst to the public, Treasury had secretly resolved "to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future." By the middle of 2012, however, it was apparent that even the large amount of Government Stock outstanding—the proverbial "concrete life preserver"—would not achieve this unlawful policy goal for Treasury.

14.     Therefore, on August 17, 2012, just days after the Companies announced their robust second quarter earnings, the Agencies unilaterally imposed the Net Worth Sweep to expropriate for the federal government the value of Fannie and Freddie shares held by private investors. Treasury itself said that the Net Worth Sweep was intended to ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will benefit taxpayers." With the stroke of a pen, the Agencies had nationalized the Companies and taken all the value of the Companies for Treasury, thereby depriving the private shareholders of all their economic rights, well in excess of the authority granted to the FHFA as conservator. The Companies received no incremental investment by Treasury or other meaningful consideration in return for the Net

7

Worth Sweep. All of this was in blatant violation of "the path laid out under HERA," which, as even Treasury acknowledged internally, was for FHFA to *rehabilitate* Fannie and Freddie, thus allowing them to "becom[e] adequately capitalized" and "exit conservatorship as private companies."

15.     Despite the transparent fact that the Net Worth Sweep was designed to expropriate private property rights, the government has claimed both in public and before the courts that the Net Worth Sweep was necessary to prevent the Companies from falling into a "death spiral" in which the Companies' increasing dividend obligations to Treasury would consume Treasury's remaining funding commitment to the Companies. For example, on the date the Net Worth Sweep was announced FHFA publicly stated that "the continued payment of a fixed dividend could have called into question the adequacy of the financial commitment contained in the PSPAs." And in litigation in the Court of Federal Claims, *Fairholme Funds, Inc. v. United States*, No. 13-465C (the "CFC case"), the Government has asserted that the Net Worth Sweep was necessary because Fannie and Freddie "found themselves in a death spiral."

16.     This factual account for the Net Worth Sweep is belied by a couple of inconvenient truths. As an initial matter, the government did not impose the Net Worth Sweep at a time when the Companies were struggling to generate enough income to pay the dividend on Treasury's stock.  Rather, the Net Worth Sweep was imposed just days after the Companies disclosed that they had returned to stable profitability and had earned several billion dollars more than was necessary to pay the Treasury dividend in cash. And it was by then virtually inevitable, thanks to a strengthening housing market and the improving quality of loans guaranteed by the Companies, that they would soon reverse the non-cash accounting adjustments that were responsible for the great majority of the losses that they had experienced in the preceding years,

Protected Information to Be Disclosed Only in Accordance With Protective Order

thereby generating massive profits. More importantly, quite apart from the Companies' improved financial outlook, the Companies were contractually protected from a scenario in which their dividend obligation to Treasury could cause a death spiral: the Companies were entitled under the PSPAs to pay Treasury's dividends "in kind," with additional senior preferred stock, rather than in cash.

17.     Given these facts, it is clear from the government's false death spiral narrative either that the Agencies that adopted the Net Worth Sweep were incompetent or that worry about the Companies exhausting Treasury's funding commitment was not the true reason for the Net Worth Sweep. Materials produced in discovery in the CFC case rule out incompetence. Indeed, that discovery has revealed that the Net Worth Sweep was adopted not out of a concern that the Companies would earn too little, but rather out of concern that the Companies would make *too much* and thus would complicate the Administration's plans to keep Fannie and Freddie in perpetual conservatorship and to prevent their private shareholders from seeing any return on their investments. As a senior White House official stated in an email to a senior Treasury official on the day the Net Worth Sweep was announced, "we've closed off [the] possibility that [Fannie and Freddie] ever[] go (pretend) private again."  That same official said in another email that Peter Wallison of the American Enterprise Institute, who spoke with Bloomberg News about the Net Worth Sweep, was "exactly right on substance and intent" when he said that "[t]he most significant issue here is whether Fannie and Freddie will come back to life because their profits will enable them to re-capitalize themselves and then it will look as though it is feasible for them to return as private companies backed by the government. . . . What the Treasury Department seems to be doing here . . . is to deprive them of all their capital so that doesn't happen."

Protected Information to Be Disclosed Only in Accordance With Protective Order

18.     Extensive evidence supports this understanding of the purpose and effect of the Net Worth Sweep, and much of it is detailed in this Complaint. But perhaps the most striking evidence relates to a meeting that occurred on August 9, 2012, between senior Treasury officials, including Under Secretary Mary Miller, and Fannie's executive management team. At the August 9 meeting, Treasury was given very specific information about Fannie's deferred tax assets: Fannie CFO Susan McFarland testified in a deposition in the CFC case that she told Under Secretary Miller that release of the valuation allowance on her company's deferred tax assets likely would happen in mid-2013 and that it likely would generate profits in the range of $50 billion—a prediction that proved remarkably accurate. It thus is no surprise that Ms. McFarland also testified that she did not think that Fannie was in a death spiral when the Net Worth Sweep was announced in mid-August 2012.

19.     The Agencies knew in advance of Treasury's August 9 meeting with Fannie that the company was likely entering a period of "golden years" of earnings. Indeed, in July 2012 the minutes of a Fannie executive management meeting during which that precise sentiment was expressed were circulated broadly within FHFA, including to Acting Director Edward DeMarco. Projections attached to those minutes showed that Fannie expected that its dividend payments to Treasury would exceed its draws under the PSPAs by 2020 and, more important for the "death spiral" narrative, that over $115 billion of Treasury's commitment would remain after 2022. Fannie management shared similar projections with Treasury in advance of the August 9 meeting described above.

20.     Fannie's July 2012 projections did not account for reversal of the Company's massive deferred tax assets valuation allowance. As Ms. McFarland predicted, that item alone would add over $50 **billion** dollars to Fannie's balance sheet. Treasury was keenly aware of this

Protected Information to Be Disclosed Only in Accordance With Protective Order

impending addition to earnings. Indeed, by late May 2012 Treasury was discussing with its consultant the topic of returning the deferred tax asset to Fannie's and Freddie's balance sheets, and a key item on Treasury's agenda for the August 9 meeting was how quickly Fannie forecasted releasing its reserves.

21.     Treasury's knowledge of Fannie's expectations for its deferred tax assets wholly discredits the declaration FHFA submitted to another district court asserting that "neither the Conservator nor Treasury envisioned at the time of the Third Amendment that Fannie Mae's valuation allowance on its deferred tax assets would be reversed in early 2013, resulting in a sudden and substantial increase in Fannie Mae's net worth, which was paid to Treasury in mid-2013 by virtue of the net worth dividend." That declaration was signed under penalty of perjury by Mario Ugoletti, who participated in the creation and implementation of the PSPAs while at Treasury, later moved to FHFA, and at the time of the Net Worth Sweep served as the principal liaison with Treasury concerning the PSPAs. And in his deposition in the CFC case, Mr. Ugoletti expressly contradicted his earlier declaration, disclaiming any knowledge at the time of the Net Worth Sweep of Treasury's understanding of the deferred tax asset issue, and he also denied knowing what anyone else at FHFA thought about the issue at that time.

22.     The Net Worth Sweep was announced just eight days after Treasury's August 9, 2012, meeting with Fannie—and internal email traffic indicates that Treasury was making a "renewed push" to finalize the Net Worth Sweep the same day it met with Fannie's management. In light of all of this, it is utterly implausible for the Agencies to claim that there was imminent concern of a "death spiral" when the Net Worth Sweep was announced. Indeed, in an internal document authored the day before the sweep was announced, Treasury specifically identified the

Protected Information to Be Disclosed Only in Accordance With Protective Order

Companies' improving operating performance and the potential for near-term earnings to *exceed* the 10% dividend as reasons for imposing the Net Worth Sweep.

23.     The Net Worth Sweep has resulted in a massive and unprecedented financial windfall for the federal government. From the fourth quarter of 2012, the first fiscal quarter subject to the Net Worth Sweep, through the third quarter of 2015, the most recently completed fiscal quarter, Fannie and Freddie generated nearly $182 billion in net income. But rather than using those profits to prudently build capital reserves and prepare to exit conservatorship, Fannie and Freddie instead have been forced to pay $186 billion in "dividends" to the federal government under the Net Worth Sweep (funded by that net income and draining prior retained earnings)—nearly $130 billion more than the government would have received under the original PSPAs. Adding Net Worth Sweep dividends to the dividends Fannie and Freddie had already paid, Treasury has now recouped $54 billion *more* than it invested in the Companies. Yet, according to Treasury, the amount of outstanding Government Stock remains firmly fixed at $189 billion, and Treasury continues to insist that it has the right to all of Fannie's and Freddie's future earnings *in perpetuity*. At the time of the Net Worth Sweep's announcement, the Agencies anticipated that it would result in a massive financial windfall.

24.     The Net Worth Sweep blatantly transgresses the limits Congress placed on FHFA's and Treasury's authority. As conservator of Fannie and Freddie, FHFA is charged with rehabilitating the Companies with a view to returning them to private control. The Net Worth Sweep guarantees that this can *never* be accomplished. Indeed, contrary to its statutory requirements and statements that it made when the conservatorship was initiated, FHFA has now indicated that it will operate Fannie and Freddie for the exclusive benefit of the government until Congress passes housing finance legislation. Holding the Companies hostage in a perpetual

12

conservatorship while awaiting potential legislative action was never an option for FHFA contemplated under HERA. And Treasury's decision to exchange its existing equity stake in the Companies for the new and different equity stake granted to it by the Net Worth Sweep years *after* its temporary authority to acquire the Companies' stock had expired is a direct affront to HERA's plain requirements. What is more, on information and belief, Treasury compelled FHFA to agree to the Net Worth Sweep despite Congress's express direction that FHFA exercise its conservatorship authority independently.

25.     By entering the Net Worth Sweep, FHFA violated HERA in at least five ways. First, FHFA failed to act as a "conservator"—indeed it has acted as an anti-conservator— because conservators are not allowed to use the companies under their care as ATM machines. Second, FHFA is required to put Fannie and Freddie in a sound and solvent condition, but the Net Worth Sweep forces the Companies to operate on the edge of insolvency by stripping the capital out of the Companies on a quarterly basis. Third, FHFA is required to conserve and preserve Fannie's and Freddie's assets, but the Net Worth Sweep requires the dissipation of assets by forcing the Companies to pay their net worth to Treasury on a quarterly basis. Fourth, FHFA is charged with rehabilitating Fannie and Freddie and seeking to return them to private control, but the Net Worth Sweep has the intent and effect of making any such outcome impossible. Finally, FHFA as conservator cannot be subject to the direction and supervision of any other government agency, but, on information and belief, FHFA entered the Net Worth Sweep at the direction and supervision of Treasury.

26.     Treasury's violation of HERA is straightforward: the Net Worth Sweep, by changing the fundamental economic characteristics of Treasury's investment, created new

Protected Information to Be Disclosed Only in Accordance With Protective Order

securities, and HERA explicitly prohibited Treasury from acquiring Fannie and Freddie securities in 2012.

27.     This Court must set aside the Net Worth Sweep and restore to Plaintiff the property rights the federal government has unlawfully expropriated for itself.

## II.
## JURISDICTION AND VENUE

28.     This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-706, and/or HERA, PUB. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. §§ 1455, 1719, 4617). The Court has subject-matter jurisdiction under 28 U.S.C. § 1331. The Court is authorized to issue the relief sought pursuant to 5 U.S.C. §§ 702, 705, and 706.

29.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because this is an action against officers and agencies of the United States, Plaintiff resides in this judicial district, and no real property is involved in the action.

## III.
## PARTIES

30.     Plaintiff Arnetia Joyce Robinson is a citizen of the United States and a resident and citizen of the Commonwealth of Kentucky. Ms. Robinson resides in Pike County.

31.     Defendant FHFA is, and was at all relevant times, an independent agency of the United States Government subject to the APA. *See* 5 U.S.C. § 551(1). FHFA was created on July 30, 2008, pursuant to HERA. FHFA is located at Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024.

32.     Defendant Melvin L. Watt is the Director of FHFA. His official address is Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024. He is being sued in his official capacity. In that capacity, Director Watt has overall responsibility for the operation and management of FHFA. Director Watt, in his official capacity, is therefore responsible for the

14

Protected Information to Be Disclosed Only in Accordance With Protective Order

conduct of FHFA that is the subject of this Complaint and for the related acts and omissions alleged herein.

33.     Defendant Department of the Treasury is, and was at all times relevant hereto, an executive agency of the United States Government subject to the APA. *See* 5 U.S.C. § 551(1). Treasury is located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220.

## IV.
## FACTUAL ALLEGATIONS

### Fannie and Freddie

34.     Fannie is a for-profit, stockholder-owned corporation organized and existing under the Federal National Mortgage Act. Freddie is a for-profit, stockholder-owned corporation organized and existing under the Federal Home Loan Corporation Act. The Companies' business includes purchasing and guaranteeing mortgages originated by private banks and bundling the mortgages into mortgage-related securities that can be sold to investors.

35.     Fannie and Freddie are owned by private shareholders and their securities are publicly traded. Fannie was chartered by Congress in 1938 and originally operated as an agency of the Federal Government. In 1968, Congress reorganized Fannie into a for-profit corporation owned by private shareholders. Freddie was established by Congress in 1970 as a wholly-owned subsidiary of the Federal Home Loan Bank System. In 1989, Congress reorganized Freddie into a for-profit corporation owned by private shareholders.

36.     Before being forced into conservatorship, both Fannie and Freddie had issued common stock, the holders of which are entitled to the residual economic value of the firms. Plaintiff owns shares of common stock of both Fannie and Freddie. She has owned shares of both Fannie and Freddie common stock continuously since September 2008. Ms. Robinson is a retired bank manager and loan officer who worked at a number of national banks with branches

Protected Information to Be Disclosed Only in Accordance With Protective Order

in Pikeville. She purchased Fannie and Freddie stock because she knew from her banking experience that Fannie and Freddie had higher standards for mortgages than other banks so she felt confident that the stock would appreciate and help fund her retirement.

37.     Prior to 2007, Fannie and Freddie were consistently profitable. In fact, Fannie had not reported a full-year loss since 1985, and Freddie had never reported a full-year loss since becoming owned by private shareholders. In addition, both Companies regularly declared and paid dividends on their common stock.

## Fannie and Freddie Are Forced into Conservatorship

38.     The Companies were well-positioned to weather the decline in home prices and financial turmoil of 2007 and 2008. While banks and other financial institutions involved in the mortgage markets had heavily invested in increasingly risky mortgages in the years leading up to the financial crisis, Fannie and Freddie had taken a more conservative approach that meant that the mortgages that they insured were far safer than those insured by the nation's largest banks. And although both Companies recorded losses in 2007 and the first two quarters of 2008—losses that largely reflected a decline in the market value of their holdings caused by declining home prices—both Companies continued to generate enough cash to easily pay their debts and retained billions of dollars of capital that could be used to cover any future losses. Neither Company was in danger of insolvency. Indeed, during the summer of 2008, both Treasury Secretary Henry Paulson and FHFA Director Lockhart publicly stated that Fannie and Freddie were financially healthy.

39.     Despite (or perhaps because of) the Companies' comparatively strong financial position amidst the crisis, Treasury initiated a long-term policy of seeking to seize control of Fannie and Freddie and operate them for the exclusive benefit of the federal government. To that

Protected Information to Be Disclosed Only in Accordance With Protective Order

end, during the summer of 2008, Treasury officials promoted short-selling of the Companies'

stock by leaking word to the press that Treasury might seek to place the Companies into

conservatorship. On July 21, 2008, Treasury Secretary Paulson personally delivered a similar

message to a select group of hedge fund managers during a private meeting at Eton Park Capital

Management. Although at odds with Treasury's on-the-record statements to the press, the leaks

and tips had the intended effect of driving down the Companies' stock prices and creating a

misperception among investors that the Companies were in financial distress.

40.     Also during the summer of 2008, Treasury pressed Congress to pass what became

the Housing and Economic Recovery Act of 2008 ("HERA"). HERA created FHFA (which

succeeded to the regulatory authority over Fannie and Freddie previously held by the Office of

Federal Housing Enterprise Oversight) and authorized FHFA, under certain statutorily prescribed

and circumscribed conditions, to place the Companies into either conservatorship or

receivership.

41.     In authorizing FHFA to act as conservator under specified circumstances,

Congress took FHFA's conservatorship mission verbatim from the Federal Deposit Insurance

Act ("FDIA"), *see* 12 U.S.C. § 1821(d)(2)(D), which itself incorporated a long history of

financial supervision and rehabilitation of troubled entities under common law. HERA and the

FDIA, as well as the common law concept on which both statutes draw, treat conservatorship as

a process designed to stabilize a troubled institution with the objective of returning it to normal

business operations. Like any conservator, when FHFA acts as a conservator under HERA it has

a fiduciary duty to safeguard the interests of the Companies and their shareholders.

42.     According to HERA, FHFA "may, as conservator, take such action as may be—

(i) necessary to put the regulated entity in a sound and solvent condition, and (ii) appropriate to

Protected Information to Be Disclosed Only in Accordance With Protective Order

carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D). Thus, as Mr. Ugoletti has testified, preserving and conserving the Companies' assets is "a fundamental part of conservatorship." FHFA has likewise acknowledged that "[t]he purpose of conservatorship is to preserve and conserve each company's assets and property and to put the companies in a sound and solvent condition," and "[t]o fulfill the statutory mandate of conservator, FHFA must follow governance and risk management practices associated with private-sector disciplines." FHFA, REPORT TO CONGRESS 2009 at i, 99 (May 25, 2010).

43.     As FHFA has acknowledged, HERA *requires* and *mandates* FHFA as conservator to preserve and conserve Fannie's and Freddie's assets and to restore them to a sound and solvent condition. FHFA 2009 Annual Report to Congress at 99 (May 25, 2010), http://goo.gl/YOOgzC ("The statutory role of FHFA as conservator requires FHFA to take actions to preserve and conserve the assets of the Enterprises and restore them to safety and soundness."); FHFA Strategic Plan at 7 (Feb. 21, 2012), http://goo.gl/uXreKX. ("FHFA has reported on numerous occasions that, with taxpayers providing the capital supporting Enterprise operations, this 'preserve and conserve' mandate directs FHFA to minimize losses on behalf of taxpayers.").

44.     Under HERA, conservatorship is a status distinct from receivership, with very different purposes, responsibilities, and restrictions. When acting as a receiver, but *not* when acting as a conservator, FHFA is authorized and obliged to "place the regulated entity in liquidation and proceed to realize upon the assets of the regulated entity." *Id*. § 4617(b)(2)(E). The only "post-conservatorship outcome[] . . . that FHFA may implement today under existing law," by contrast, "is to reconstitute [Fannie and Freddie] under their current charters." Letter

Protected Information to Be Disclosed Only in Accordance With Protective Order

from Edward J. DeMarco, Acting Director, FHFA, to Chairmen and Ranking Members of the Senate Committee on Banking, Housing, and Urban Affairs and to the House Committee on Financial Services 7 (Feb. 2, 2010). In other words, receivership is aimed at winding down an entity's affairs and liquidating its assets, while conservatorship aims to rehabilitate it and return it to normal operation. This distinction between the purposes and authorities of a receiver and a conservator is a well-established tenet of financial regulation.

45.     In promulgating regulations governing its operations as conservator or receiver of the Companies, FHFA specifically acknowledged the distinctions in its statutory responsibilities as conservator and as receiver: "A conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition." Conservatorship and Receivership, 76 Fed. Reg. 35,724, 35,730 (June 20, 2011). In contrast, when FHFA acts as a receiver, the regulation specifically provides that "[t]he Agency, as receiver, *shall* place the regulated entity in liquidation . . . ." 12 C.F.R. § 1237.3(b) (emphasis added).

46.     On September 6, 2008, FHFA—under significant pressure from Treasury— directed the Companies' boards to consent to conservatorship. Given that the Companies were not in financial distress and were in no danger of defaulting on their debts, the Companies' directors were confronted with a Hobson's choice: face intense scrutiny from federal agencies for rejecting conservatorship or submit to the demands of Treasury and FHFA. The Agencies ultimately obtained the Companies' consent by threatening to seize them if they did not acquiesce and by informing them that the Agencies had already selected new CEOs and had teams ready to move in and take control.

47.     In publicly announcing the conservatorship, FHFA committed itself to operate Fannie and Freddie as a fiduciary until they are stabilized. As FHFA acknowledged, the

Protected Information to Be Disclosed Only in Accordance With Protective Order

Companies' common stock remains outstanding during conservatorship and "continue[s] to trade," *FHFA Fact Sheet, Questions and Answers on Conservatorship* 3, https://goo.gl/DV4nAt, and Fannie's and Freddie's stockholders "continue to retain all rights in the stock's financial worth," *id.* Director Lockhart testified before Congress that Fannie's and Freddie's "shareholders are still in place; both the preferred and common shareholders have an economic interest in the companies" and that "going forward there may be some value" in that interest. Sept. 25, 2008, Hearing, U.S. House of Representatives, Committee on Financial Servs, H.R. Hrg. 110-142 at 29-30, 34.

48.     FHFA also emphasized that the conservatorship was temporary: "Upon the Director's determination that the Conservator's plan to restore the [Companies] to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship." *FHFA Fact Sheet, Questions and Answers on Conservatorship* 2. Investors were entitled to rely on these official statements of the purposes of the conservatorship, and public trading in Fannie's and Freddie's stock was permitted to, and did, continue.

49.     In short, the Companies were not in financial distress when they were forced into conservatorship. The Companies' boards permitted conservatorship based on the understanding that, like any other conservator, FHFA would operate the Companies as a fiduciary with the goal of preserving and conserving their assets and managing them in a safe and solvent manner. And in publicly announcing the conservatorships, FHFA confirmed that the Companies' private shareholders continued to hold a residual economic interest that would have value if the Companies generated profits in the future.

## FHFA and Treasury Enter into the Purchase Agreements

Protected Information to Be Disclosed Only in Accordance With Protective Order

50.     On September 7, 2008, Treasury and FHFA, acting in its capacity as conservator of Fannie and Freddie, entered into the Preferred Stock Purchase Agreements.

51.     In entering into the Purchase Agreements, Treasury exercised its temporary authority under HERA to purchase securities issued by the Companies. *See* 12 U.S.C. §§ 1455(*l*), 1719(g). To exercise that authority, the Secretary of the Treasury ("Secretary") was required to determine that purchasing the Companies' securities was "necessary . . . to provide stability to the financial markets; . . . prevent disruptions in the availability of mortgage finance; and . . . protect the taxpayer." 12 U.S.C. §§ 1455(*l*)(1)(B), 1719(g)(1)(B). In making those determinations, the Secretary was required to consider six factors:

> (i) The need for preferences or priorities regarding payments to the Government.
> (ii) Limits on maturity or disposition of obligations or securities to be purchased.
> (iii) *The [Companies'] plan[s] for the orderly resumption of private market funding or capital market access.*
> (iv) The probability of the [Companies] fulfilling the terms of any such obligation or other security, including repayment.
> (v) *The need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies].*
> (vi) Restrictions on the use of [the Companies'] resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

*Id.* §§ 1455(*l*)(1)(C), 1719(g)(1)(C) (emphasis added).

52.     Treasury's authority under HERA to purchase the Companies' securities expired on December 31, 2009, *see id.* §§ 1455(*l*)(4), 1719(g)(4), and HERA's legislative history underscores the temporary nature of that authority. Secretary Paulson testified to Congress that HERA would give "Treasury an 18-month *temporary* authority to purchase—only if necessary— equity in either of these two [Companies]." *Recent Developments in U.S. Financial Markets and Regulatory Responses to Them: Hearing before the Comm. on Banking, Housing and Urban*

Protected Information to Be Disclosed Only in Accordance With Protective Order

*Dev.*, 100th Cong. (2008) (statement of Henry M. Paulson, Secretary, Dep't of the Treasury) at 5 (emphasis added). In response to questioning from Senator Shelby, Secretary Paulson reiterated that Treasury's authority to purchase Fannie and Freddie stock was intended to be a "short-term" solution that would expire at "the end of 2009." *Id.* at 11-12.

53.    Treasury's PSPAs with Fannie and Freddie are materially identical. Under the original unamended agreements, Treasury committed to provide up to $100 billion to each Company to ensure that it maintained a positive net worth. In particular, for quarters in which either Company's liabilities exceed its assets under Generally Accepted Accounting Principles, the PSPAs authorize Fannie and Freddie to draw upon Treasury's commitment in an amount equal to the difference between its liabilities and assets.

54.    In return for its funding commitment, Treasury received 1 million shares of Government Stock in each Company and warrants to purchase 79.9% of the common stock of each Company at a nominal price. Exercising these warrants would entitle Treasury to up to 79.9% of all future profits of the Companies, subject to the Companies' obligation to share the remaining 20.1% of those profits with private common shareholders. As Treasury noted in entering the PSPAs, the warrants "provide potential future upside to the taxpayers." Action Memorandum for Secretary Paulson (Sept. 7, 2008).

55.    Treasury's Government Stock in each Company had an initial liquidation preference of $1 billion. This liquidation preference increases by one dollar for each dollar the Companies receive from Treasury pursuant to the PSPAs. In the event the Companies liquidate, Treasury is entitled to recover the full liquidation value of its shares before any other shareholder may recover anything.

Protected Information to Be Disclosed Only in Accordance With Protective Order

56.     In addition to the liquidation preference, the original unamended PSPAs provided for Treasury to receive either a cumulative cash dividend equal to 10% of the value of the outstanding liquidation preference or a stock dividend. If the Companies decided not to pay the dividend in cash, the value of the dividend would be added to the liquidation preference—effectively amounting to an in-kind dividend payment of additional Government Stock. After an in-kind dividend payment, the dividend rate would increase to 12% until such time as full cumulative dividends were paid in cash, at which time the rate would return to 10%. The plain terms of the PSPAs thus make clear that Fannie and Freddie never were required to pay a cash dividend to Treasury but rather had the discretion to pay dividends in kind.

57.     Numerous materials prove beyond any reasonable doubt that the Agencies recognized that the PSPAs were designed, as their express terms plainly provide, to allow the payment of dividends in kind—additional senior preferred stock—rather than in cash. Jeff Foster, one of the architects of the Net Worth Sweep at Treasury, has testified in a deposition in the CFC case that he could not identify any "problems of the circularity [in dividend payments that] would have remained had the [payment-in-kind] option been adopted." In an internal October 2008 email to Mario Ugoletti—who was then a Treasury official, but later moved to FHFA and was a key point of contact with Treasury in the development of the Net Worth Sweep—another Treasury official indicated that Treasury's consultant wanted to know "whether we expect [Fannie and Freddie] to pay the preferred stock dividends in cash or to just accrue the payments." Mr. Ugoletti did not forget about this feature of the PSPAs when he moved to FHFA. Indeed, he described the "payment-in-kind" option as part of the pre-Net Worth Sweep dividend structure during a deposition in May 2015 in the CFC case. In a similar vein, a document attached to a September 16, 2008 email between FHFA officials expressly states that PSPA

Protected Information to Be Disclosed Only in Accordance With Protective Order

dividends may be "paid in-kind." In an October 2008 email to Treasury and FHFA officials, a Treasury consultant asked whether Fannie and Freddie "intend[ed] to pay cash at 10 percent or accrue at 12 percent as a matter of policy." An internal Treasury document says that the dividend rate "may increase to the rate of 12 percent if, in any quarter, the dividends are not paid in cash." And an internal FHFA document says that Treasury's senior stock pays "10 percent cash dividend (12 percent payment-in-kind)."

58.      Agency documents already in the public domain also support this understanding of the payment-in-kind option. Upon entering the PSPAs Treasury released a fact sheet stating that, "[t]he senior preferred stock shall accrue dividends at 10% per year. The rate shall increase to 12% if, in any quarter, the dividends are not paid in cash . . . ." U.S. TREASURY DEP'T OFFICE OF PUB. AFFAIRS, FACT SHEET: TREASURY SENIOR PREFERRED STOCK PURCHASE AGREEMENT (Sept. 7, 2008), https://goo.gl/ynb3TC. And in a June 2012 presentation to the Securities and Exchange Commission that Treasury publicly filed in litigation in another case, Treasury stated that the dividend rate of the PSPAs would be 12% "if elected to be paid in kind." Treasury Presentation to SEC, GSE Preferred Stock Purchase Agreements (PSPA), Overview and Key Considerations at 9, June 13, 2012.

59.      The Companies shared this understanding of the terms of their agreements with Treasury. Fannie's and Freddie's CFOs have testified in the CFC case that they were aware of the payment-in-kind option. Various Freddie documents say that "[t]he dividend becomes 12% if Freddie Mac is unable to pay the dividend through organic income," that "[t]he senior preferred stock will pay quarterly cumulative dividends at a rate of 10% per year or 12% in any quarter in which dividends are not paid in cash," that Treasury's stock "[p]ays quarterly cumulative dividend rate at 10% per year, or 12% in any quarter in which dividends are not paid in cash,"

Protected Information to Be Disclosed Only in Accordance With Protective Order

and that Treasury's stock "will pay quarterly cumulative dividends at a rate of 10% per year, or 12% in any quarter in which dividends are not paid in cash." Similarly, Fannie documents say that "Treasury's preferred stock "has an annual dividend rate of 10%, which could increase to 12% if not paid in cash," and that "[i]f at any time . . . the Company does not pay the cash dividends in a timely manner, . . . the annual dividend rate will be 12%."

60.     Moreover, even if the Agencies and the Companies had taken a different view of the express terms of the PSPAs, there was never any risk that payment of dividends would render the Companies insolvent since it would have been illegal for either Company to pay a dividend that would render it insolvent.

61.     An in-kind dividend payment would not decrease Treasury's funding commitment because only when the Companies receive "funding under the Commitment" does its size decrease. Fannie and Freddie Amended and Restated Senior Preferred Stock Purchase Agreements ("PSPA") § 1. Thus, as the Congressional Research Service has acknowledged, under the PSPAs' original terms the Companies could "pay a 12% annual senior preferred stock dividend indefinitely." N. ERIC WEISS, CONG. RESEARCH SERV., RL34661, FANNIE MAE'S AND FREDDIE MAC'S FINANCIAL PROBLEMS (Aug. 10, 2012). In other words, because of the payment-in-kind option, there was no risk—none whatsoever—that the PSPAs would force Fannie and Freddie to exhaust Treasury's funding commitment to facilitate the payment of dividends.

62.     Finally, the PSPAs provided for the Companies to pay Treasury a quarterly periodic commitment fee "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment." PSPA § 3.2(a). The periodic commitment fee was to be set for five-year periods by agreement of the Companies and Treasury, but Treasury had the option to waive it for up to a year at a time. Treasury has exercised this option and has never received a periodic

Protected Information to Be Disclosed Only in Accordance With Protective Order

commitment fee under the PSPAs. Even if the fee had been charged, the Companies were always free under the express terms of the PSPAs to pay the fee in-kind with additional senior preferred stock rather than in cash, a fact that Freddie's auditor recognized in a document produced in the CFC case.

63.     The PSPAs and the Government Stock Certificates explicitly contemplate that the Companies could pay down the liquidation preference and that when it is paid down "in full, such [Government Stock] shares shall be deemed to have been redeemed." Certificate §§ 3(c), 4(c). Indeed, the PSPAs were "structure[d]" to "enhance the probability of both Fannie Mae and Freddie Mac ultimately repaying amounts owed." Action Memorandum for Secretary Paulson (Sept. 7, 2008).

64.     The PSPAs prohibit Fannie and Freddie from declaring and paying dividends on any securities junior to Treasury's Government Stock unless full cumulative dividends have been paid to Treasury on its Government Stock for the then-current and all past dividend periods.

65.     In approving the exercise of Treasury's temporary authority under HERA to purchase securities of the Companies, Treasury Secretary Paulson determined (1) "[u]nder conservatorship, Fannie Mae and Freddie Mac will continue to operate as going concerns"; (2) "Fannie Mae and Freddie Mac may emerge from conservatorship to resume independent operations"; and (3) "[c]onservatorship preserves the status and claims of the preferred and common shareholders." Action Memorandum for Secretary Paulson (Sept. 7, 2008).

### Treasury and FHFA Amend the Purchase Agreements
### To Increase Treasury's Funding Commitment

66.     On May 6, 2009, the Agencies amended the terms of the Purchase Agreements to increase Treasury's funding commitment to both Fannie and Freddie. In particular, under the

Protected Information to Be Disclosed Only in Accordance With Protective Order

amendment Treasury's total commitment to each Company increased from $100 billion to $200 billion.

67.     On December 24, 2009—one week before Treasury's temporary authority under HERA expired—the Agencies again amended the terms of Treasury's funding commitment. Instead of setting that commitment at a specific dollar amount, the second amendment established a formula to allow Treasury's total commitment to each Company to exceed (but not fall below) $200 billion depending upon any deficiencies experienced in 2010, 2011, and 2012, and any surplus existing as of December 31, 2012.

68.     Treasury's authority under HERA then expired on December 31, 2009. As Treasury acknowledged, expiration of this authority meant that its "ability to make further changes to the PSPAs . . . [was] constrained." Action Memorandum for Secretary Geithner at 3 (Dec. 22, 2009).

## The Agencies Force Accounting Changes To Increase the Companies' Draws From Treasury

69.     Beginning in the third quarter of 2008—when FHFA took control of the Companies as conservator—the conservator began to make overly pessimistic and unrealistic assumptions about the Companies' future financial prospects. Those assumptions triggered adjustments to the Companies' balance sheets, most notably write-downs of significant tax assets and the establishment of large loan loss reserves, which caused the Companies to report non-cash losses. Although reflecting nothing more than accounting assumptions about the Companies' future prospects and having no effect on the cash flow the Companies were generating, these non-cash losses temporarily decreased the Companies' reported net worth by hundreds of billions of dollars. For example, in the first year and a half after imposition of the conservatorship, Fannie reported $127 billion in losses, but only $16 billion of that amount

Protected Information to Be Disclosed Only in Accordance With Protective Order

reflected actual credit-related losses. Upon information and belief, FHFA directed Fannie and Freddie to record these excessive non-cash losses at the insistence of Treasury, which resulted in excessive purchases of Government Stock by Treasury.

70.     By the end of 2011, the Companies' reported net worth had fallen by $100 billion as a result of the decision made shortly after imposition of the conservatorship to write down the value of their deferred tax assets. A deferred tax asset is an asset that may be used to offset future tax liability. Under Generally Accepted Accounting Principles, if a company determines that it is unlikely that some or all of a deferred tax asset will be used, the company must establish a "valuation allowance" in the amount that is unlikely to be used. In other words, a company must write down a deferred tax asset if it is unlikely to be used to offset future taxable profits. Shortly after FHFA took control of the Companies, FHFA made the implausible assumption that the Companies would *never again* generate taxable income and that their deferred tax assets were therefore worthless. That flawed decision dramatically reduced the Companies' reported net worth.

71.     The decision to designate excessive loan loss reserves was another important factor in the artificial decline in the Companies' reported net worth during the early years of conservatorship. Loan loss reserves are an entry on the Companies' balance sheets that reduces their reported net worth to reflect anticipated losses on the mortgages they own. Beginning when FHFA took control of the Companies in the third quarter of 2008 and continuing through 2009, the Companies were forced to provision additional loan loss reserves far in excess of the credit losses they were actually experiencing. The extent to which excess loan loss reserve provisioning reduced the Companies' net worth is dramatically illustrated by the following chart, which compares Fannie's loan loss reserve provisioning to its actual credit losses for 2006 through

Protected Information to Be Disclosed Only in Accordance With Protective Order

2014. As the chart shows, FHFA caused Fannie to make grossly excessive loan loss reserve

provisions in 2008 and 2009. The excessive nature of these loan loss provisions was readily

apparent by 2012, and the inevitable reversals would flow through to income on Fannie's

balance sheet.



72.     Despite the fact that the Companies' mortgage portfolios were safer than the

similar portfolios held by banks involved in the mortgage business, banks were much more

accurate—and far less aggressive—in reducing their net worth to reflect expected loan losses.

The following chart illustrates this fact:

29

Protected Information to Be Disclosed Only in Accordance With Protective Order



**Fannie and Freddie Combined Loan Loss Provisioning vs. Loan Loss Provisioning by Banks**

73.     To date, the Companies have drawn a total of $187 billion from Treasury, in large part to fill the holes in the Companies' balance sheets created by these non-cash losses. Including Treasury's initial $1 billion liquidation preference in each Company, Treasury's liquidation preference for its Government Stock amounts to approximately $117 billion for Fannie and approximately $72 billion for Freddie. Approximately $26 billion of these combined amounts were drawn simply to pay the 10% dividend payments owed to Treasury. (In other words, FHFA requested draws to pay Treasury this $26 billion in cash rather than electing to pay the dividends in kind. Had the dividends been paid in kind, FHFA would not have had to draw from—and, consequently, reduce the remaining size of—Treasury's commitment to pay them.) Thus, Treasury actually "invested" approximately $161 billion in the Companies, primarily reflecting temporary changes in the valuation estimates of assets and liabilities.

Protected Information to Be Disclosed Only in Accordance With Protective Order

<u>**The Companies Return to Profitability and Stability**</u>

74.     As explained above, the "losses" Fannie and Freddie experienced under conservatorship were driven primarily by temporary and overly pessimistic accounting decisions, not by a failure to generate enough revenue to cover their expenses. Indeed, although they had reported significant declines in their net worth as a result of highly questionable accounting decisions, even in the early years of conservatorship they had continued to generate enough cash to cover their expenses. As the following chart illustrates, the Companies' annual net operating revenue has exceeded their net operating expenses in every year during the conservatorships except 2010, and their actual losses were never so severe that they would have had a negative net worth but for the excessively pessimistic treatment of deferred tax assets and loan loss reserves:



75.     By 2012, Fannie and Freddie began generating consistent profits notwithstanding the anchor of their overstated loss reserves and the write-down of their deferred tax assets. Fannie has not drawn on Treasury's commitment since the fourth quarter of 2011, and Freddie

31

has not drawn on Treasury's commitment since the first quarter of 2012. In fact, in the first two quarters of 2012, the Companies posted sizable profits totaling more than $11 billion.

76.     By 2012, the Companies were well-positioned to continue generating robust profits for the foreseeable future. Fannie's and Freddie's financial results are strongly influenced by home prices. And as FHFA's own Home Price Index shows, the market reached its bottom in 2011:



77.     The improving housing market was coupled with stricter underwriting standards at Fannie and Freddie. As a result—and as the Agencies knew—Fannie- and Freddie-backed loans issued after 2008 had dramatically lower serious delinquency rates than loans issued between 2005 and 2008. The strong quality of these newer "vintages" of loans boded well for Fannie's and Freddie's future financial prospects.

78.     Together, the Companies' return to robust profitability and the stable recovery of the housing market showed in early 2012 that the Companies could in time redeem Treasury's

Protected Information to Be Disclosed Only in Accordance With Protective Order

Government Stock and provide a return on investment to owners of their common stock. Indeed, a presentation sent to senior Treasury officials in February 2012 indicated that "Fannie and Freddie could have the earnings power to provide taxpayers with enough value to repay Treasury's net cash investments in the two entities." The Companies' financial performance and outlook only further improved in the ensuing months.  In the weeks leading up to the Net Worth Sweep, one Treasury official observed that Freddie's second quarter 2012 results were "very positive," and a report circulated among senior FHFA officials said that the agency deserved a "high five" for the Companies' strong financial outlook.

79.     Furthermore, as a result of Fannie's and Freddie's return to sustained profitability, it was clear that the overly pessimistic accounting decisions weighing down the Companies' balance sheets would have to be reversed. Indeed, by early August 2012, the Agencies knew that Fannie and Freddie were poised to generate massive profits well in excess of the Companies' dividend obligations to Treasury—profits that would make the $11 billion the Companies generated in the first half of 2012 look small by comparison.

80.     By August 2012, the Agencies knew that the Companies' reserves for loan losses far exceeded their actual losses. These excess loss reserves artificially depressed the Companies' net worth, and reversing them would increase the Companies' net worth accordingly. Indeed, on July 19, 2012, a Treasury official observed that the release of loan loss reserves could "increase the [Companies'] net [worth] substantially." And the Agencies were focused on this issue. An internal briefing memorandum prepared for Under Secretary Miller in advance of the August 9, 2012 meetings with Fannie and Freddie executives reveals that the number one question Treasury had for the Companies was "how quickly they forecast releasing credit reserves." And a handwritten note on a presentation from the August 9 meeting with Freddie says to "expect

Protected Information to Be Disclosed Only in Accordance With Protective Order

material release of loan loss reserves in the future." FHFA also knew that loan loss reserve releases would boost the Companies' profits going forward, as FHFA officials attended a meeting of Freddie's Loan Loss Reserve Governance Committee on August 8, 2012. FHFA's knowledge of the status of the Companies' loan loss reserves is also dramatically illustrated by a July 2012 FHFA presentation showing that starting in 2008 the Companies had set aside loan loss reserves far in excess of their actual losses.

81.    Another principal driver of the outsized profits that the Companies would inevitably generate was the mandated release of the Companies' deferred tax assets valuation allowances. By mid-2012, Fannie and Freddie had combined deferred tax assets valuation allowances of nearly $100 billion. Under relevant accounting rules, those valuation allowances would have to be reversed if the Companies determined that it was more likely than not that they would generate taxable income and therefore be able to use their deferred tax assets. The Treasury Department was intimately familiar with these issues, having seen such a reversal in February 2012 in connection with its massive investment in AIG. In 2011, it was also known within Fannie that the valuation allowance would be reversed; the only question was the timing.

82.    Indeed, by the time the Net Worth Sweep was announced, it was apparent to the Agencies that Fannie and Freddie would soon be in a position to reverse the valuation allowances for their deferred tax assets. On July 13, 2012, Bradford Martin, Principal Advisor in FHFA's Office of Conservatorship Operations, broadly circulated within FHFA minutes from a July 9, 2012 Fannie executive management meeting. The recipients of the email included Acting Director DeMarco and Mr. Ugoletti. The minutes stated that Fannie Treasurer David Benson "referred to the next 8 years as likely to be 'the golden years of GSE earnings.' " Projections were attached to the email containing the following slide:

Protected Information to Be Disclosed Only in Accordance With Protective Order



83.     Those projections expressly stated the assumption that Fannie would not be paying taxes because it would be using its deferred tax assets—and if Fannie was expecting to use its deferred tax assets, it would have to release the valuation allowance it had established for them. FHFA knew this; indeed, FHFA accountants were monitoring the Companies' deferred tax assets situation, and FHFA knew that the Companies' audit committees were assessing the status of the valuation allowances on a quarterly basis. In addition, Ms. McFarland testified in the CFC case that in July 2012 she would have mentioned the potential release of the valuation allowance at a Fannie executive committee meeting attended by at least one FHFA official, and she also testified that FHFA was on notice of a statement she made to Under Secretary Miller on August 9, 2012 regarding the potential release of the valuation allowance before the Agencies entered the third amendment to the PSPAs on August 17, 2012.

Protected Information to Be Disclosed Only in Accordance With Protective Order

84.     Like FHFA, Treasury was in possession of information showing that the Companies would soon generate substantial profits, thus making it inevitable that they would release their deferred tax asset valuation allowances.  In November 2011, Treasury consultant Grant Thornton prepared projections based on September 2011 data reporting combined profits of over $20 billion in 2014, with annual profits then gradually declining to a long-term figure of about $13.5 billion. Profits of this magnitude necessarily would have led to the reversal of the valuation allowances. And Treasury took notice. Hand-written notes on a Grant Thornton document produced by Treasury displaying Freddie's results through the first quarter of 2012 anticipate that Freddie could release its valuation allowance "probably [in] 2013, 2014." And the agenda for a meeting indicates that by May 2012 Treasury and Grant Thornton were discussing "[r]eturning the deferred tax asset to the GSE balance sheets."

85.     The manager of Grant Thornton's valuation services to Treasury, Anne Eberhardt, admitted in a deposition in the CFC case that the projections based on September 2011 data were no longer valid 11 months later, and Fannie's CFO, Susan McFarland, has testified that it was particularly important to have fresh financial forecasts at that time. Mr. Ugoletti and Ms. Eberhardt likewise have testified to the importance of using up-to-date financial information, and Mr. DeMarco testified that FHFA as conservator was "constantly responding to a changing economic environment." And as Mr. DeMarco also testified, one change that took place between September 2011 and mid-August 2012 "was strengthening in the housing market." Thus, by August 2012, it was apparent that the outdated Grant Thornton projections drastically *underestimated* Fannie's and Freddie's earning capacity. (Mr. Ugoletti also has admitted that FHFA's own projections consistently were overly pessimistic leading up to August 2012.) Treasury and FHFA knew this, and they knew that reversal of the deferred tax asset valuation

Protected Information to Be Disclosed Only in Accordance With Protective Order

allowances was mandated by applicable accounting rules and was imminent. As previously

detailed, this fact came into sharp focus on August 9, 2012, when Under Secretary Miller and

other senior Treasury officials had meetings with the senior executives of both Fannie and

Freddie. During the meeting with Fannie's management, Treasury was presented with ten-year

projections substantially similar to those that Fannie had previously shared with FHFA, showing

the Company earning an average of more than $11 billion per year from 2012 through 2022 and

having over $116 billion left of Treasury's funding commitment at the end of that time period.

Those projections are reproduced below:

Protected Information to Be Disclosed Only in Accordance With Protective Order

## Annual Detail of Cumulative Dividends and SPSPA Draws

**Fannie Mae**

| ($ in Billions) | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive Income | | 11.6 | 7.5 | 11.0 | 12.5 | 13.9 | 13.2 | 12.2 | 11.4 | 10.9 | 10.5 | 10.5 |
| Preferred Dividend Payment | 19.8 | 11.6 | 11.8 | 12.1 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.3 | 12.5 |
| Residual Equity | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 1.8 | 2.8 | 2.7 | 1.9 | 0.5 | 0.0 | 0.0 |
| Cumulative Dividends | 19.8 | 31.4 | 43.2 | 55.3 | 67.6 | 79.8 | 92.1 | 104.3 | 116.6 | 128.8 | 141.1 | 153.6 |
| Cumulative SPSPA Draws | (116.1) | (116.1) | (119.0) | (121.2) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (122.9) | (124.3) |
| Cumulative Dividends Less Draws | (96.3) | (84.7) | (75.8) | (65.9) | (53.9) | (41.7) | (29.4) | (17.2) | (4.9) | 7.3 | 18.3 | 28.8 |
| SPSPA Funding Cap | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 |
| Remaining Funding under SPSPA | 124.8 | 124.8 | 122.0 | 119.7 | 119.5 | 119.5 | 119.5 | 119.5 | 119.5 | 119.5 | 118.1 | 116.1 |

Note: 2012-2016 figures from Fannie Mae July BOD corporate forecast. 2017-2022 figures are based on simplifying assumptions derived from trends observed within the 2012-2016 horizon.

**Freddie Mac**

| ($ in Billions) | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive Income | | 11.6 | 7.5 | 8.2 | 8.6 | 9.0 | 8.7 | 8.3 | 7.7 | 7.1 | 6.7 | 6.5 |
| Preferred Dividend Payment | 16.3 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 |
| Residual Equity | 0.0 | 0.0 | 0.4 | 1.7 | 3.5 | 5.6 | 6.9 | 7.9 | 8.1 | 7.9 | 7.2 | 6.3 |
| Cumulative Dividends | 16.3 | 23.7 | 31.1 | 38.4 | 45.8 | 53.2 | 60.6 | 68.0 | 75.4 | 82.8 | 90.2 | 97.6 |
| Cumulative SPSPA Draws | (72.2) | (116.1) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) |
| Cumulative Dividends Less Draws | (55.9) | (92.4) | (41.9) | (34.5) | (27.1) | (19.7) | (12.3) | (4.9) | 2.5 | 9.9 | 17.3 | 24.7 |
| SPSPA Funding Cap | 220.5 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 |
| Remaining Funding under SPSPA | 148.3 | 105.2 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 |

Note: 2012-2022 figures are based on simplifying assumptions derived from Fannie Mae forecast trends and observed relationships between key Fannie Mae and Freddie Mac performance metrics. Reported 2011 results re-aligned as necessary to correspond to Fannie Mae management reporting.

Note: Numbers may not foot due to rounding

7

Confidential Commercial Information - Confidential Treatment and FOIA Exemption Requested



86.    Furthermore, Treasury learned that Fannie's near-term earnings likely would be even higher than those in the projections due to the release of the Companies' deferred tax assets valuation allowance. Treasury's top agenda item heading into the meetings with Fannie was "how quickly [the Company] forecast[s] releasing credit reserves." During the August 9 meeting, Fannie CFO Susan McFarland informed Treasury that the criteria for reversing the deferred tax assets valuation allowance could be met in the not-so-distant future. And when asked for more

38

specifics by Under Secretary Miller, Ms. McFarland stated that the reversal would be probably in the $50-billion range and probably sometime mid-2013, an assessment that proved remarkably accurate.

87.     While Mr. Ugoletti stated in a sworn declaration in the United States District Court for the District of Columbia that "neither the Conservator nor Treasury envisioned at the time of the Third Amendment that Fannie Mae's valuation allowance on its deferred tax assets would be reversed in early 2013," his deposition testimony in the CFC case contradicts that statement: "I don't know who else in FHFA or what they knew about the potential for that [i.e., that the deferred tax assets might be written back up in 2013], but . . . our accountants were monitoring this situation, they were monitoring . . . whether to revalue, they had to do it all the time, revalue or not revalue, and I do not recall knowing about that this was going to be an issue until really '13 when it became imminent that, oh, this has to happen now, and I don't know what anybody else thought about it." And when asked whether he knew "what Treasury thought about it," he answered, "I do not."

88.     In sum, by August 2012 the Agencies knew that Fannie and Freddie were poised to add tens of billions of dollars of deferred tax assets to their balance sheets and to reverse billions of dollars of loan loss reserves. These inevitable accounting decisions, coupled with Fannie's and Freddie's strong earnings from their day-to-day operations, meant that Fannie and Freddie would generate earnings well in excess of the Companies' dividend obligations to Treasury for the foreseeable future.

89.     In addition to the release of loan loss reserves and deferred tax assets valuation allowances, Fannie and Freddie also had sizeable assets in the form of claims and suits brought by FHFA as conservator relating to securities law violations and fraud in the sale of private-label

Protected Information to Be Disclosed Only in Accordance With Protective Order

securities to Fannie and Freddie between 2005 and 2007. In 2013 and 2014, the Companies

recovered over $18 billion from financial institutions via settlements of such claims and suits.

The Companies, FHFA, and Treasury knew in August 2012 that the Companies would reap

substantial profits from such settlements.

### FHFA and Treasury Amend the PSPAs To Expropriate Private Shareholders' Investment and Ensure Fannie and Freddie Cannot Exit Conservatorship

90.     On August 17, 2012, within days after the Companies had announced their return

to profitability and just as it was becoming clear that they had regained the earnings power to

redeem Treasury's Government Stock and exit conservatorship, the Agencies unilaterally

amended the PSPAs for a third time. At the time that this third amendment was under

consideration, Fannie and Freddie were experiencing a dramatic turnaround in their profitability.

Due to rising house prices and reductions in credit losses, in early August 2012 the Companies

reported significant income for the second quarter 2012 and neither required a draw from

Treasury under the PSPAs. What is more, the Agencies knew that Fannie and Freddie were

poised to generate massive profits from the reversal of overly pessimistic accounting decisions

made in the early years of the conservatorships. But rather than fulfilling its statutory

responsibility as conservator to return the Companies to sound and solvent business operations

and, ultimately, to private control, FHFA entered into the Net Worth Sweep with Treasury,

which transfers all of the Companies' substantial profits to Treasury and prevents them from ever

exiting government control and providing a return on private shareholders' investment.

91.     The timing of the Net Worth Sweep was driven by the Companies' return to

profitability. Given that return to profitability, there was no imminent risk that Fannie and

Freddie would be depleting Treasury's funding commitment—that risk likely was at its lowest

point since the start of the conservatorships. Communications within both FHFA and Treasury in

Protected Information to Be Disclosed Only in Accordance With Protective Order

the months leading up to the Net Worth Sweep confirm that fact by indicating that the Companies' bond investors regarded Treasury's funding commitment as sufficient. Rather than worry over exhausting Treasury's funding commitment, the "risk" that concerned the Agencies—indeed, their expectation—was that Fannie and Freddie would recognize extraordinary profits that would allow them to begin rebuilding their capital levels and position themselves to exit conservatorship and deliver value to their private shareholders.

92.     But notwithstanding their statutory duties, the Administration had decided that Fannie and Freddie would *not* be allowed to exit conservatorship in their current form. Allowing Fannie and Freddie to rebuild their capital levels, however, would make that political decision more difficult to explain and sustain. It is thus not surprising that a document prepared for internal Treasury consumption and dated August 16, 2012 listed the Companies' "improving operating performance" and the "potential for near-term earnings to exceed the 10% dividend" as reasons for the timing of the Net Worth Sweep, and it also is not surprising that FHFA perceived a "renewed push" from Treasury to implement the Net Worth Sweep on August 9, 2012.

93.     Communications involving White House official Jim Parrott provide further proof that the Net Worth Sweep was intended to keep Fannie and Freddie under the government's control and to dash the hopes of private investors of ever seeing any return on their investments. At the time of the Net Worth Sweep, Mr. Parrott was a senior advisor at the National Economic Council, where he led a team of advisors charged with counseling President Obama and the cabinet on housing issues. He worked closely with Treasury in the development and rollout of the Net Worth Sweep. Indeed, the day after the Net Worth Sweep was announced, he emailed Treasury officials congratulating them on achieving an important policy goal: "Team Tsy, You guys did a remarkable job on the PSPAs this week. You delivered a policy change of enormous

41

Protected Information to Be Disclosed Only in Accordance With Protective Order

importance that's actually being recognized as such by the outside world . . ., and as a credit to the Secretary and the President." What Treasury had accomplished, Mr. Parrott's emails make clear, was guaranteeing that Fannie and Freddie would remain in perpetual conservatorship and never again be run for the benefit of their private shareholders:

- In an email to a Treasury official on the day the Net Worth Sweep was announced, Mr. Parrott stated that "we've closed off [the] possibility that [Fannie and Freddie] ever[] go (pretend) private again."

- That same day, Mr. Parrott received an email from a market analyst stating that the Net Worth Sweep "should lay to rest permanently the idea that the outstanding privately held pref[ferred stock] will ever get turned back on." He forwarded the email to Treasury officials and commented that "all the investors will get this very quickly." (Mr. Ugoletti similarly was not surprised "that the preferred stock got hammered the day the Net Worth Sweep was announced.")

- At 8:30 a.m. on August 17, Mr. Parrott wrote an email to Alex Pollock, Peter Wallison, and Edward Pinto offering "to walk you through the changes we're announcing on the pspas today. Feel like fellow travelers at this point so I owe it to you." Pollock, Wallison, and Pinto had written a policy paper for the American Enterprise Institute in 2011 recommending that "Fannie Mae and Freddie Mac should be eliminated as government-sponsored enterprises (GSEs) over time."

- Also on August 17, Mr. Wallison was quoted in Bloomberg saying the following: "The most significant issue here is whether Fannie and Freddie will come back to life because their profits will enable them to re-capitalize themselves and then it will look as though it is feasible for them to return as private companies backed by the government. . . . What

Protected Information to Be Disclosed Only in Accordance With Protective Order

the Treasury Department seems to be doing here, and I think it's a really good idea, is to deprive them of all their capital so that doesn't happen." In an email to Wallison that evening, Mr. Parrott stated, "Good comment in Bloomberg—**you are exactly right on substance and intent.**"

Mr. Parrott, who has left the Administration and is now with the Urban Institute, recently told The Economist that "[i]n the aftermath of the crisis there was widespread agreement that [Fannie and Freddie] needed to be replaced or overhauled." *A Funny Form of Conservation*, THE ECONOMIST, Nov. 21, 2015, *available at* http:goo.gl/gJVJrN. The Net Worth Sweep ensured that the Companies' return to profitability did not threaten this goal.

94.     This understanding of the purpose of the Net Worth Sweep is further supported by the testimony of Ms. McFarland, Fannie's CFO at the time. She believed that the Agencies imposed the Net Worth Sweep in response to what she told Treasury on August 9, and she thought its purpose "was probably a desire not to allow capital to build up within the enterprises and not to allow the enterprises to recapitalize themselves." According to Ms. McFarland, Fannie "didn't believe that Treasury would be too fond of a significant amount of capital buildup inside the enterprises."

95.     As Treasury stated when the Net Worth Sweep was announced, the dividend sweep of all of the Companies' net worth requires that "every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers." Press Release, U.S. Dep't of the Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012). The Net Worth Sweep, in short, effectively nationalized the Companies and confiscated the existing and potential value of all privately held equity interests, including the stock held by Plaintiff.

Protected Information to Be Disclosed Only in Accordance With Protective Order

96.     As a Staff Report from the Federal Reserve Bank of New York recently acknowledged, the Net Worth Sweep "effectively narrows the difference between conservatorship and nationalization, by transferring essentially all profits and losses from the firms to the Treasury." W. Scott Frame, et al., *The Rescue of Fannie Mae and Freddie Mac* at 21, FEDERAL RESERVE BANK OF NEW YORK STAFF REPORTS, no. 719 (Mar. 2015). The Economist stated the obvious in reporting that the Net Worth Sweep "squashe[d] hopes that [Fannie and Freddie] may ever be private again" and, as a result, "the companies' status as public utilities . . . appear[ed] crystal clear." Fannie Mae and Freddie Mac, *Back to Black*, THE ECONOMIST, Aug. 25, 2012, *available at* http:goo.gl/1PHMs.

97.     As a result of the Net Worth Sweep, it is clear that FHFA will not allow Fannie and Freddie to exit conservatorship but rather will continue to operate them essentially as wards of the state, unless and until Congress takes action. Indeed, as of this writing FHFA's website states that "FHFA will continue to carry out its responsibilities as Conservator" until "Congress determines the future of Fannie Mae and Freddie Mac and the housing finance market." FHFA as Conservator of Fannie Mae and Freddie Mac, http://goo.gl/PjyPZb. This is consistent with the testimony of former Acting Director DeMarco, who stated that he had no intention of returning Fannie and Freddie to private control under charters he perceived to be "flawed." Mr. Ugoletti also testified that FHFA's objective "was not for Fannie and Freddie Mac to emerge from conservatorship." HERA does not contemplate that FHFA will operate a perpetual conservatorship that is entirely contingent on the hope of unspecified legislative action at some point in the future.

98.     The Net Worth Sweep fundamentally changed the nature of Treasury's investment in the Companies. Instead of quarterly dividend payments at an annual rate of 10% (if

Protected Information to Be Disclosed Only in Accordance With Protective Order

paid in cash) or 12% (if paid in kind) of the total amount of Treasury's liquidation preference, the Net Worth Sweep entitles Treasury to quarterly payments of *all—100%*—of the Companies' existing net worth and future profits. Beginning January 1, 2013, the Companies have been required to pay Treasury a quarterly dividend equal to their *entire net worth*, minus a capital reserve amount that starts at $3 billion and decreases to $0 by January 1, 2018.

99.     The Net Worth Sweep is extraordinary because it makes the Companies unique in financial regulation. Other financial institutions are required to retain minimum levels of capital that ensure that they can withstand the vicissitudes of the economic cycle and are prohibited from paying dividends when they are not adequately capitalized. The Companies, in contrast, are not allowed to retain capital but instead must pay their entire net worth over to Treasury as a quarterly dividend. The effect of the Net Worth Sweep is thus to force the Companies to operate in perpetuity on the brink of insolvency and with no prospect of ever generating a return for private shareholders. In other contexts, federal regulators understand such an arrangement to be fundamentally unsafe and unsound.

100.    Forcing the Companies to operate in this inherently unsafe and unsound condition also has deleterious effects on their borrowing costs, which is a major expense for both Companies. As former Acting Director DeMarco has admitted, if the Companies are highly leveraged and have a relatively small amount of capital then, all other things being equal, their cost of borrowing will be higher.

101.    The Companies did not receive any meaningful consideration for agreeing to the Net Worth Sweep. Because the Companies always had the option to pay dividends "in kind" at a 12% interest rate, the Net Worth Sweep did not provide the Companies with any additional flexibility or benefit. Rather than accruing a dividend at 12% (which never had to be paid in

Protected Information to Be Disclosed Only in Accordance With Protective Order

cash), FHFA unlawfully agreed to make a payment of substantially all the Companies' net worth each quarter.

102.    The Net Worth Sweep also provides that the Companies will not have to pay a periodic commitment fee under the PSPAs while the Net Worth Sweep is in effect. But Treasury had consistently waived the periodic commitment fee before the Net Worth Sweep, and it could only set the amount of such a fee with the agreement of the Companies and at a market rate. And that rate likely would have been, at most, a small fraction of the outstanding amount of Treasury's commitment. Freddie forecasted its "sensitivity" to imposition of a periodic commitment fee as follows: "Our sensitivity to a commitment fee based on remaining commitment available beginning in 2013 of $149 billion shows that a 25 bps fee results in a $0.4 billion annual impact on Stockholders' Equity." Further, the purpose of the fee was to compensate Treasury for its ongoing support in the form of the commitment to invest in the Companies' Government Stock. By the time of the Net Worth Sweep, the 10 percent return on the Government Stock and the warrants for 79.9 percent of the common stock provided a more than adequate return on the government's stand-by commitment, and thus any additional fee would have been inappropriate. In August of 2012, the Companies had returned to stable profitability and were no longer drawing from Treasury's commitment. Given the Companies' return to profitability, the market rate for the periodic commitment fee in 2012, 2013, and 2014 would have been zero. And, of course, by the time of the Net Worth Sweep, Treasury's temporary authority to purchase the Companies' securities had already expired, making any further purchases contrary to law. Finally, even if a market-rate fee had been agreed between Treasury and FHFA and imposed pursuant to the PSPA, the Companies had sufficient market power to pass the entire amount of this fee through to their customers—as the Companies do for

46

other operating and financing costs—without affecting profitability or the value of the Companies' equity securities.

103.    For the foregoing reasons, Mr. Ugoletti's statement, in his sworn declaration to the District Court for the District of Columbia, that the value of the periodic commitment fee was "incalculably large" is wholly inaccurate. Indeed, Mr. Ugoletti subsequently testified that he could not recall discussing his idea that the value of the fee was incalculably large with anyone at FHFA or Treasury, that he did not know whether anybody shared that view, that he is neither "an expert on periodic commitment fees," nor "in the business of calculating" such fees, and that he did not know whether anyone at FHFA or Treasury ever tried to calculate the value of the periodic commitment fee. Mr. DeMarco also testified that he could not recall anyone at FHFA attempting to quantify what the periodic commitment fee would have been in the absence of the Net Worth Sweep.

104.    As the Agencies anticipated, Fannie and Freddie have been extraordinarily profitable since the imposition of the Net Worth Sweep. From the third quarter of 2012 through the third quarter of 2015, Fannie and Freddie have reported total net income of $116 billion and $68 billion, respectively.

105.    As the Agencies also anticipated, Fannie's 2013 net income included the release of over $50 billion of the company's deferred tax assets valuation allowance. The release of this valuation allowance underscores Fannie's financial strength, as it demonstrates Fannie's expectation that it will generate sizable taxable income moving forward. Fannie relied on the following evidence of future profitability in support of the release of its valuation allowance:

- Its profitability in 2012 and the first quarter of 2013 and expectations regarding the sustainability of these profits;
- Its three-year cumulative income position as of March 31, 2013;

Protected Information to Be Disclosed Only in Accordance With Protective Order

- The strong credit profile of the loans it had acquired since 2009;
- The significant size of its guaranty book of business and its contractual rights for future revenue from this book of business;
- Its taxable income for 2012 and its expectations regarding the likelihood of future taxable income; and
- That its net operating loss carryforwards will not expire until 2030 through 2031 and its expectation that it would utilize all of these carryforwards within the next few years.

106.   Freddie's 2013 earnings also reflect the Company's decision to release a sizeable (in excess of $20 billion) deferred tax assets valuation allowance. Freddie relied on the following evidence in support of its release of its valuation allowance:

- Its three-year cumulative income position as of September 30, 2013;
- The strong positive trend in its financial performance over the preceding six quarters, including the quarter ended September 30, 2013;
- The 2012 taxable income reported in its federal tax return which was filed in the quarter ended September 30, 2013;
- Its forecasted 2013 and future period taxable income;
- Its net operating loss carryforwards do not begin to expire until 2030; and
- The continuing positive trend in the housing market.

107.   The Net Worth Sweep has proven to be immensely profitable for the federal government. The table below lists only the dividends Fannie and Freddie have paid under the Net Worth Sweep, and it does not include dividends paid before that time[1]:

**Dividend Payments Under the Net Worth Sweep**
**(in billions)**

---

[1] The Q4 2015 dividend amount has been established by the Q3 results and is due to be paid on December 31, 2015. It is included in the table and in other calculations in the Amended Complaint relating to dividend payments under the PSPAs.

Protected Information to Be Disclosed Only in Accordance With Protective Order

|  |  | Fannie | Freddie | Combined |
|---|---|---|---|---|
| **2013** | Q1 | **$4.2** | **$5.8** | **$10.0** |
|  | Q2 | **$59.4** | **$7.0** | **$66.4** |
|  | Q3 | **$10.2** | **$4.4** | **$14.6** |
|  | Q4 | **$8.6** | **$30.4** | **$39.0** |
| **2014** | Q1 | **$7.2** | **$10.4** | **$17.6** |
|  | Q2 | **$5.7** | **$4.5** | **$10.2** |
|  | Q3 | **$3.7** | **$1.9** | **$5.6** |
|  | Q4 | **$4.0** | **$2.8** | **$6.8** |
| **2015** | Q1 | **$1.9** | **$0.9** | **$2.8** |
|  | Q2 | **$1.8** | **$0.7** | **$2.5** |
|  | Q3 | **$4.4** | **$3.9** | **$8.3** |
|  | Q4 | **$2.2** | **$0.0** | **$2.2** |
| **Total** |  | **$113.3** | **$72.7** | **$186.0** |

108.    As the above chart shows, the Companies have paid Treasury $186 billion in "dividends" under the Net Worth Sweep. Had they instead been paying 10% cash dividends, they would have paid Treasury approximately $57 billion. The following chart shows how imposition of the Net Worth Sweep dramatically increased the size of the Companies' dividend payments to Treasury:

49

Protected Information to Be Disclosed Only in Accordance With Protective Order



109.    The Net Worth Sweep has thus unlawfully usurped nearly $130 billion from the Companies and sent it all into Treasury's coffers. As explained above, the Agencies knew that the Net Worth Sweep would result in a massive financial windfall for the federal government.

110.    The Net Worth Sweep is squarely contrary to FHFA's statutory responsibilities as conservator of Fannie and Freddie. As conservator FHFA is obligated to "take such action as may be—(i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D). As FHFA itself has acknowledged, the agency "has a statutory charge to work to restore a regulated entity in conservatorship to a sound and solvent condition . . . ." 76 Fed. Reg. at 35,727. Accordingly, "allowing capital distributions to deplete the entity's conservatorship assets would be

50

inconsistent with the agency's statutory goals, as they would result in removing capital at a time when the Conservator is charged with rehabilitating the regulated entity." *Id.* Thus, FHFA's own regulations generally prohibit Fannie and Freddie from making a "capital distribution while in conservatorship," subject to certain exceptions. 12 C.F.R. § 1237.12(a). Indeed rather than putting Fannie and Freddie in sound and solvent condition the Net Worth Sweep's reduction and eventual elimination of the Companies' capital reserves *increases* the likelihood of additional Treasury investment in the Companies while eliminating the possibility that private shareholders will ever receive a return on their investment.

111.     But for the Net Worth Sweep Fannie and Freddie would have nearly $130 billion of additional capital to cushion them from any future downturn in the housing market and to reassure debtholders of the soundness of their investments. Instead, because of the Net Worth Sweep, the Companies are required to operate at the edge of insolvency, making them fundamentally unsafe and unsound and more likely to require an additional government bailout in the future. Depleting capital in this way is antithetical to the basic mission of a conservator. Indeed, former Acting Director DeMarco has testified that capital levels are "a key component of the safety and soundness of a regulated financial institution" and that, as a general matter, he thought that there should be more capital in the Companies to increase their safety and soundness.

112.     The Net Worth Sweep's quarterly sweep of all net profits thus plainly prevents the Companies from operating in a sound and solvent manner by prohibiting them from rebuilding their capital. Nor can distributing the entire net worth of the Companies to Treasury be reconciled with FHFA's statutory obligation to preserve and conserve their assets and property.

Protected Information to Be Disclosed Only in Accordance With Protective Order

113.     FHFA fully understood that stripping capital out of a financial institution is the antithesis of operating it in a sound manner. Its recognition of the importance of capital levels is demonstrated by an event that took place shortly after the Net Worth Sweep was announced. Fannie initially determined that the Company should reverse its deferred tax assets valuation allowance as of December 31, 2012. Doing so, however, would reduce the amount of Treasury's remaining funding commitment under the formula established by the second amendment to the PSPAs. FHFA strongly opposed this reduction of the funding commitment, which it viewed as a form of capital available to the Companies: "Capital is key driver for composite rating of critical concerns. The reduction in capital capacity from the U.S. Treasury and the SPSA agreements places undue risk on the future of Fannie Mae in conservatorship." Indeed, FHFA threatened Fannie that "if the amount of funds available under the agreement was reduced as a result of our releasing the valuation allowance in the fourth quarter of 2012, they would need to ensure the preservation of our remaining capital and undertake regulatory actions that could severely restrict our operations, increase our costs, or otherwise substantially limit or change our business in order to ensure the continued safety and soundness of our operations." As a result of this pressure from FHFA, Fannie reconsidered its decision and waited until the following quarter to release its valuation allowance, when the release would no longer affect the size of Treasury's funding commitment under the PSPAs. Waiting this extra quarter preserved approximately $34 billion of Treasury's funding commitment. The Net Worth Sweep, by contrast, has *reduced* the capital available to Fannie by a much larger amount—nearly $130 billion, to date.

114.     Furthermore, on information and belief, FHFA agreed to the Net Worth Sweep only at the insistence and under the direction and supervision of Treasury. The Net Worth Sweep was a Treasury initiative and reflected the culmination of Treasury's long-term plan to seize the

Protected Information to Be Disclosed Only in Accordance With Protective Order

Companies and see that they were operated for the exclusive benefit of the federal government. It was Treasury that informed the Companies just days before the Net Worth Sweep that it was forthcoming, and a meeting addressing the Net Worth Sweep was held at Treasury during which a senior Treasury official announced the changes. Secretary Geithner apparently believed that even before the Net Worth Sweep "we had already effectively nationalized the GSEs . . ., and could decide how to carve up, dismember, sell or restructure those institutions." Plaintiff's Corrected Post-Trial Proposed Findings of Fact 26.2.1(a), *Starr Int'l Co. v. United States*, No. 1:11-cv-779-TCW (Fed. Cl. March 2, 2015), ECF No. 430. The Net Worth Sweep is just one example of the significant influence Treasury has exerted over FHFA from the beginning of the conservatorship. Indeed, Secretary Paulson has written that "seizing control" of Fannie and Freddie, an action that is statutorily reserved to FHFA, was an action "I took," HENRY M. PAULSON, JR., ON THE BRINK xiv (2d ed. 2013), and Secretary Geithner, who was president of the Federal Reserve Bank of New York at the time, understood the federal takeover of Fannie and Freddie to be a "Treasury operation." Similarly, Congressional Budget Office Assistant Director for Financial Analysis Deborah Lucas told Congress that the Companies are subject to "ownership and control by the Treasury." *Fannie Mae, Freddie Mac & FHA: Taxpayer Exposure in the Housing Markets: Hearing Before the H. Comm. on the Budget*, 112th Cong. 15 (2011).

115. The Net Worth Sweep is merely one element of Treasury's broader plan to transform the housing finance market and to eliminate Fannie and Freddie. Indeed, a housing finance reform plan drafted by Treasury in early 2012 listed "restructur[ing] the PSPAs to allow for variable dividend payment based on positive net worth"—i.e., implementing a net worth sweep—as among the first steps to take in transitioning to Treasury's desired outcome. Other

Protected Information to Be Disclosed Only in Accordance With Protective Order

elements of that plan included the development of a single securitization utility to be used by both Fannie and Freddie—and by other entities once Fannie and Freddie are eliminated. FHFA has made the development of such a utility a key initiative of the conservatorships, providing further evidence that FHFA is operating according to Treasury's playbook.

116.    Treasury, however, lacks the authority to impose such direction and supervision, and FHFA lacks the authority to submit to it. HERA expressly provides that "[w]hen acting as conservator, . . . [FHFA] shall not be subject to the direction or supervision of any other agency of the United States . . . ." 12 U.S.C. § 4617(a)(7). And Treasury officials intimately involved in the development of the Net Worth Sweep testified that they could not recall Treasury making any backup or contingency plans to prepare for any possibility that FHFA would reject the Net Worth Sweep proposal.

117.    Contrary to statutory authority, both Treasury and FHFA understood the Net Worth Sweep to be a step toward the liquidation, not the rehabilitation, of the Companies. This was in stark contrast to FHFA's then-Acting Director's statement two years earlier that, absent legislative action, "the only [post-conservatorship option] that FHFA may implement today under existing law is to reconstitute [Fannie and Freddie] under their current charters." February 2, 2010 Letter of Acting Director DeMarco to Chairmen and Ranking Members of the Senate Committee on Banking, Housing, and Urban Affairs and the House Committee on Financial Services. Communications between FHFA and Treasury, however, indicate that by January 2012 the Agencies shared common goals that included providing the public and financial markets with a clear plan to wind down Fannie and Freddie.

118.    Statements by both FHFA and Treasury provide further confirmation that the Net Worth Sweep violates FHFA's statutory restrictions as conservator. Treasury, for example, said

Protected Information to Be Disclosed Only in Accordance With Protective Order

the Net Worth Sweep would "expedite the wind down of Fannie Mae and Freddie Mac," and it emphasized that the "quarterly sweep of every dollar of profit that each firm earns going forward" would make "sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers." Press Release, U.S. Dep't of the Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012). Indeed, Treasury emphasized that the Net Worth Sweep would ensure that the Companies "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." *Id.*

119.    Unbeknownst to the public, as early as December 2010, an internal Treasury memorandum acknowledged the "Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future." Action Memorandum for Secretary Geithner (Dec. 20, 2010). Just weeks later, however, in another internal document the author of this memorandum acknowledged that "the path laid out under HERA and the Paulson Treasury when the [the Companies] were put into conservatorship in September 2008" was for Fannie and Freddie to "becom[e] adequately capitalized" and "exit conservatorship as private companies" with "existing common shareholders" being "substantially diluted"—but not eliminated. Memorandum from Jeffery A. Goldstein, Undersecretary of Domestic Finance, to Timothy Geithner, United States Secretary of the Treasury at 4 (Jan. 4, 2011). The memorandum also acknowledged that any threat to Treasury's funding commitment from dividend payments potentially could be addressed by "converting [Treasury's] preferred stock into common or cutting or deferring payment of the dividend (under legal review)." *Id.* In other words, the problem Treasury was purportedly trying to solve with the

Net Worth Sweep, a cash dividend too high to be serviced by earnings, could be addressed by other means already known to Treasury, such as cutting or deferring payment of the dividend.

120.    Furthermore, as explained above, because of the payment-in-kind option available to FHFA and the Companies, the purported "circular dividend" problem was entirely illusory. Moreover, another option was floated that would have preserved Treasury's funding commitment—having a net worth sweep dividend kick in only if Treasury's funding commitment was drawn down to $100 billion or less. Nevertheless, in 2012 the Agencies implemented the Administration's secret and unauthorized commitment to wipe out private shareholders by having the Companies enter into the Net Worth Sweep.

121.    FHFA Acting Director Edward DeMarco informed a Senate Committee that the "recent changes to the PSPAs, replacing the 10 percent dividend with a net worth sweep, reinforce the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status." Edward J. DeMarco, Acting Director, FHFA, Statement Before the U.S. Sen. Comm. on Banking & Urban Affairs 3 (Apr. 18, 2013). In its 2012 report to Congress, FHFA explained that it had begun "prioritizing [its] actions to move the housing industry to a new state, one without Fannie Mae and Freddie Mac." FHFA, 2012 REP. at 13. Thus, according to FHFA, the Net Worth Sweep "ensures all the [Companies'] earnings are used to benefit taxpayers" and "reinforces the fact that the [Companies] will not be building capital." *Id.* at 1, 13. In short, the Net Worth Sweep plainly is central to the FHFA's new plan to "wind[] up the affairs of Fannie and Freddie," Remarks of Edward J. DeMarco, Getting Our House in Order at 6 (Wash., D.C., Oct. 24, 2013), and thus cannot be reconciled with the agency's statutory obligations as conservator of Fannie and Freddie.

Protected Information to Be Disclosed Only in Accordance With Protective Order

122.     While purportedly waiting for Congress to initiate potential legislative action on Fannie and Freddie, FHFA has resolved to operate the Companies for the exclusive benefit of the federal government rather than for the benefit of the Companies themselves and their private stakeholders. The Net Worth Sweep is only the most blatant manifestation of this egregious decision, which is reflected in numerous additional FHFA statements and actions. In short, while HERA directs FHFA to operate the Companies in a manner that rebuilds their capital and returns them to private control, FHFA has resolved to operate Fannie and Freddie with a view toward "minimiz[ing] losses on behalf of taxpayers," FHFA, A STRATEGIC PLAN FOR ENTERPRISE CONSERVATORSHIPS: THE NEXT CHAPTER IN A STORY THAT NEEDS AN ENDING 7 (Feb. 21, 2012)—a goal that ignores a simple reality: no such losses have been incurred, and Treasury has to date realized an approximately $54 billion profit. Indeed, FHFA has made clear that its "overriding objectives" are to operate Fannie and Freddie to serve the federal government's policy goals of "[g]etting the most value for taxpayers and bringing stability and liquidity to housing finance . . . ." *Id*. at 21. Director Watt summed up the situation succinctly when stating that he does not "lay awake at night worrying about what's fair to the shareholders" but rather focuses on "what is responsible for the taxpayers." Nick Timiraos, *FHFA's Watt 'Comfortable' with U.S. Sweep of Fannie, Freddie Profits*, WALL STREET JOURNAL MONEY BEAT BLOG (May 16, 2014, 3:40 PM), http://goo.gl/Tltl0U.

123.     Following FHFA's lead, Fannie's management has publicly acknowledged that it does not routinely consider the interests of private shareholders when operating the company. Timothy Mayopoulos, Fannie's CEO, recently said that his company's management is "not looking to maximize profits for investors" and that he is "less interested in what happens to Fannie Mae as a legal entity." Fannie has also expressly disavowed any fiduciary duty to its

Protected Information to Be Disclosed Only in Accordance With Protective Order

private shareholders in its SEC filings. *See* Fannie Mae 2014 Annual Report at 1 (Form 10-K) (Feb. 20, 2015), http://goo.gl/FZofs6 ("Our directors do not have any fiduciary duties to any person or entity except to the conservator and, accordingly, are not obligated to consider the interests of the company, [or] the holders of our equity or debt securities . . . unless specifically directed to do so by the conservator.").

124.     The dramatically negative impact of the Net Worth Sweep on the Companies' private shareholders is demonstrated by Fannie's results in the first quarter of 2013. At the end of the first quarter Fannie's net worth stood at $62.4 billion. Under the prior versions of the PSPAs, if Fannie chose to declare a cash dividend it would have been obligated to pay Treasury a dividend of only $2.9 billion, and the balance—$59.5 billion—would have been credited to its capital. Private shareholders, of course, would have had an economic interest in that capital. The Net Worth Sweep, however, required Fannie to pay Treasury $59.4 billion, while private shareholders received nothing.

125.     Contrary to FHFA's statutory authority, FHFA has ensured that the Companies cannot operate independently and must be wards of the federal government. FHFA has announced that, during the conservatorship, existing statutory and FHFA-directed regulatory capital requirements will not be binding on the Companies. And at the end of 2012, Fannie had a deficit of core capital in relation to statutory minimum capital of $141.2 billion. This deficit decreased to $88.3 billion by the end of the first quarter of 2013. When adjusted for the $59.4 billion dividend payment to Treasury, however, Fannie's core capital deficit jumped back up to $147.7 billion. Thus, because of the Net Worth Sweep, Fannie was in a ***worse*** position with respect to its core capital—and thus further from being able to generate a return on private

Protected Information to Be Disclosed Only in Accordance With Protective Order

shareholders' investments—than it was before the record-breaking profitability it achieved in the first quarter of 2013.

126.    Furthermore, under FHFA's conservatorship Fannie and Freddie have elected to pay Treasury its dividend in cash, even though their net worth includes changes in both cash and non-cash assets. In the first quarter of 2013, for example, over $50 billion of Fannie's profitability resulted from the release of the Company's deferred tax assets valuation allowance—the same non-cash asset that previously created massive paper losses for the Company. As a result, Fannie was required to "fund [its] second quarter dividend payment of $59.4 billion primarily through the issuance of debt securities." Fannie, 2013 First Quarter Report, at 42.

127.    Borrowing money to pay an enormous dividend on a non-cash profit (due to an accounting reversal) is without precedent in a conservatorship. It also is clearly contrary to FHFA's statutory obligations as conservator, as FHFA is operating the Companies in an inherently unsafe and unsound manner and hindering the ability of the Companies to restore their financial health so that they can be returned to normal business operations.

128.    The Net Worth Sweep has become a major revenue source for the United States Government at the expense of Plaintiff and other private shareholders. For example, the federal government's record-breaking $53.2 billion surplus for the month of December 2013 was driven in large part by the $39 billion swept from Fannie and Freddie.

129.    As previously noted, Treasury's temporary statutory authority to purchase the securities of the Companies was conditioned on its consideration of certain statutory factors, including "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]" and the Companies' plans "for the orderly resumption of private market funding or

Protected Information to Be Disclosed Only in Accordance With Protective Order

capital market access." *See* 12 U.S.C. §§ 1455(*l*)(1)(C), 1719(g)(1)(C). There is no public record that Treasury considered these factors before executing the Net Worth Sweep, and Treasury has asserted that it did not need to consider them. Indeed, the terms of the Net Worth Sweep requiring the quarterly payment of all profits and the winding down of the Companies' operations are wholly inconsistent with these factors. There is also no evidence that Treasury adequately considered alternatives to the Net Worth Sweep that would have been consistent with its statutory obligations, less harmful to Plaintiff and other private shareholders, and more likely to ensure the Companies' future solvency. Finally, there is no evidence that Treasury fulfilled the statutory requirement to report exercises of its temporary purchase authority to Congress upon entering the Net Worth Sweep. *See* 12 U.S.C. §§ 1455(*l*)(1)(D); 1719(g)(1)(D).

130.    FHFA made no public record of its contemporaneous decision-making processes in agreeing to the Net Worth Sweep. There is no public record that FHFA adequately considered whether the Net Worth Sweep is consistent with its statutory obligations as conservator of the Companies. Treasury's stated purpose of winding down the Companies, which necessarily involves liquidating their assets and property, is incompatible on its face with FHFA's charge to put the Companies back into "a sound and solvent condition" and to "conserve [their] assets and property." There is also no evidence that FHFA adequately considered alternatives to the Net Worth Sweep that would have been both consistent with its statutory obligations and less harmful to private shareholders. Instead, there are statements by FHFA—including in its own Strategic Plan for the Companies—that the role of the conservator was to "minimize taxpayer losses" rather than protect and conserve the Companies.

131.    Finally, there is no public record that either government agency—Treasury or FHFA—considered whether the Net Worth Sweep is consistent with the contractual and

Protected Information to Be Disclosed Only in Accordance With Protective Order

fiduciary duties to private shareholders. And the Net Worth Sweep is wholly inconsistent with those duties.

## Dividend Payments Under the Purchase Agreements

132.    Fannie has drawn $116.1 billion from Treasury under the PSPAs, while Fannie's purported dividends to Treasury under the PSPAs total $144.7 billion. Freddie has drawn $71.3 billion from Treasury under the PSPAs, while Freddie's purported dividends to Treasury under the PSPAs total $96.5 billion. Combined, Fannie and Freddie have paid Treasury approximately $54 billion more than they have received.

133.    Yet, under the Net Worth Sweep, these purported dividend payments do not operate to pay down the liquidation preference or otherwise redeem any of Treasury's Government Stock. The liquidation preference of Treasury's Government Stock in the Companies purportedly remains at approximately $189 billion (due to the Companies' draws and the $1 billion initial valuation of Treasury's Government Stock in each) and will remain at that amount regardless of how many billions of dollars the Companies pay to Treasury in dividends going forward. The Government's rate of return is infinite, like that of a common equity holder.

134.    Indeed, the fundamental nature of the change in Treasury's investment resulting from the Net Worth Sweep is illustrated by the facts that Treasury is now effectively Fannie's and Freddie's *sole* equity shareholder and that Treasury's securities in the Companies are now effectively equivalent to 100% of the Companies' common stock. After giving effect to the Net Worth Sweep, Treasury has both the right to receive all profits of the Companies as well as control over the manner in which the Companies conduct business. Accordingly, following the Net Worth Sweep, Treasury's Government Stock should be characterized in a manner consistent with its economic fundamentals as 100% of the Companies' common stock. Indeed, the

Protected Information to Be Disclosed Only in Accordance With Protective Order

Government Stock must be deemed as common or voided altogether because, by definition, preferred stock must have preferences over other classes of stock. *See* 8 DEL. CODE tit. 8, § 151(c); VA. CODE § 13.1-638(C)(4). After the Net Worth Sweep, of course, the economic rights of other classes of Fannie and Freddie stock have been effectively eliminated, leaving nothing for the Government Stock to have preference over. The Government Stock simply takes *everything*.

135.    That FHFA and Treasury continue to label the Government Stock as a preferred equity security is not controlling, particularly in light of the fact that the Net Worth Sweep was not an arms-length business transaction. Rather it was a self-dealing arrangement between two agencies of the federal government for the benefit of the federal government and, upon information and belief, one of those agencies (FHFA) was acting at the direction of the other (Treasury). Moreover, as explained above, statements by Treasury and FHFA make clear that the Net Worth Sweep was designed with the intent to grant the federal government the right to all of Fannie's and Freddie's future profits and to ensure that the Companies will remain under the control of the federal government and not return to the control of their private shareholders.

## CLAIMS FOR RELIEF

### COUNT I

### FHFA's Conduct Exceeded Its Statutory Authority As Conservator

136.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

137.    The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(C), (D). In addition to the limitations established under the APA, FHFA's authority as conservator of the Companies is strictly limited by statute. *See* 12 U.S.C. § 4617(b)(2)(D).

62

Protected Information to Be Disclosed Only in Accordance With Protective Order

138.    The Net Worth Sweep is inimical to the very definition of what it means to be a conservator, which is a term with a well-established meaning in financial regulation. A conservator is charged with seeking to rehabilitate the company under its control, not to operate the company for its own benefit while stripping it of its assets.

139.    The Net Worth Sweep is in direct contravention of the statutory command that FHFA as conservator must undertake those actions "necessary to put the [Companies] in a sound and solvent condition" and "appropriate to carry on the business of the [Companies] and preserve and conserve [their] assets and property." 12 U.S.C. § 4617(b)(2)(D). Indeed, rather than seeking to put the Companies in a "sound and solvent" condition and to preserve and conserve the Companies' assets and property, FHFA has expropriated the Companies' entire net worth for the benefit of the federal government, to the detriment of private shareholders such as Plaintiff.

140.    Furthermore, FHFA's purpose as conservator is to seek to rehabilitate Fannie and Freddie, but the Net Worth Sweep makes such rehabilitation impossible. Rather, the Net Worth Sweep makes clear that FHFA and Treasury intend to keep Fannie and Freddie in conservatorship indefinitely, operating them for the sole benefit of the federal government, unless Congress passes legislation resolving the situation.

141.    On information and belief, FHFA agreed to the Net Worth Sweep only at the insistence and under the direction and supervision of Treasury. But because HERA mandates that FHFA perform its duties as conservator independent of the "direction or supervision of any other agency," 12 U.S.C. § 4617(a)(7), FHFA was not authorized to subject itself to Treasury's will.

142.    FHFA also acted beyond its authority by re-interpreting its statutory duty as a conservator under HERA to be a duty to taxpayers only and by resolving to hold Fannie and Freddie in a perpetual conservatorship to be operated for the benefit of the federal government.

Protected Information to Be Disclosed Only in Accordance With Protective Order

143. FHFA's conduct was therefore outside of FHFA's authority under HERA and "in excess of statutory . . . authority" and "without observance of procedure required by law," and Plaintiff is therefore entitled to relief against FHFA pursuant to 5 U.S.C. §§ 702, 706(2)(C), (D).

## COUNT II

### Treasury's Conduct Exceeded Its Statutory Authority

144. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

145. The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(C), (D).Treasury's statutory authority to purchase securities issued by the Companies expired on December 31, 2009. 12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4). The Net Worth Sweep, which was executed on August 17, 2012, contravenes this unambiguous limit on Treasury's authority.

146. The Net Worth Sweep created an entirely new security. Under the original Purchase Agreements, Treasury purchased Government Stock that entitled it to a 10% cash or 12% in-kind quarterly dividend on an amount equal to the aggregate liquidation preference of the Government Stock. The Government Stock was a fixed return security not otherwise entitled to participate in the unlimited upside of the Companies' earnings. By contrast, the Net Worth Sweep entitles Treasury to a quarterly distribution of *all* of the Companies' earnings for as long as they remain in operation. The Net Worth Sweep thus effected a wholesale change to the nature of Treasury's securities after its statutory authority to purchase new securities had expired, and it converted Treasury's Government Stock into new securities that nationalize the Companies and entitle Treasury to 100% of their net worth as if Treasury were the outright owner of all common stock in the Companies. Treasury cannot evade this clear statutory restriction on its authority to purchase securities of the Companies by the simple expedient of

Protected Information to Be Disclosed Only in Accordance With Protective Order

calling these new securities an "amendment" to the old securities. As former Acting Director DeMarco has testified, the Net Worth Sweep amounted to "an *exchange* [of] one set of compensation to Treasury for another one."

147.    In addition, before exercising its temporary authority to purchase securities, Treasury is required to "determine that such actions are necessary to . . . (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer." 12 U.S.C. § 1719(g)(1)(B). In making the statutorily required determinations, Treasury must consider such factors as "the [Companies'] plan[s] for the orderly resumption of private market funding or capital market access" and "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]," among other factors. *Id.* § 1719(g)(1)(C)(iii), (v).

148.    These statutory criteria must apply to any and all "amendments" to the Purchase Agreements. Were it otherwise, Treasury could fundamentally alter its investments in the Companies at any time, including after its investment authority has expired and effectively turn Treasury's limited, temporary grant of authority to purchase the Companies' securities under certain conditions, into an unconstrained and permanent authority and subvert the statutory limitations imposed by Congress.

149.    As far as the public record discloses, Treasury did not make any of the required determinations or consider any of the necessary factors before imposing the Net Worth Sweep. It therefore exceeded its statutory authority.

150.    The Net Worth Sweep is beyond Treasury's authority because it is not compatible with due consideration of factors that Treasury must consider before purchasing the Companies' securities or amending its agreements to purchase such securities. The Net Worth Sweep

Protected Information to Be Disclosed Only in Accordance With Protective Order

destroys the value of the Companies' private stock. The Net Worth Sweep is therefore wholly incompatible with "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]" and with the "orderly resumption of private market funding or capital market access."

151.    On information and belief, FHFA agreed to the Net Worth Sweep only at the insistence and under the direction and supervision of Treasury. But because HERA mandates that FHFA "shall not be subject to the direction or supervision of any other agency" when performing its duties as conservator for the Companies, 12 U.S.C. § 4617(a)(7), Treasury acted in excess of its authority in imposing its will on FHFA.

152.    Treasury's conduct was therefore outside of Treasury's authority under HERA and "in excess of statutory . . . authority" and "without observance of procedure required by law," and Plaintiff is therefore entitled to relief against Treasury pursuant to 5 U.S.C. §§ 702, 706(2)(C), (D).

**COUNT III**

**Treasury's Conduct Was Arbitrary and Capricious**

153.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

154.    The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This means, among other things, that agency action is unlawful unless it is the product of "reasoned decisionmaking" that considers every responsible alternative. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52. Decisionmaking that relies on inadequate evidence or that results in inconsistent or contradictory conclusions cannot satisfy that standard.

Protected Information to Be Disclosed Only in Accordance With Protective Order

155.    Before Treasury exercises its temporary authority to purchase the Companies'
securities, it is required to determine that the financial support is necessary to "provide stability
to the financial markets," "prevent disruptions in the availability of mortgage finance," and
"protect the taxpayer." 12 U.S.C. §§ 1455(*l*)(1)(B), 1719(g)(1)(B). In making these
determinations, Treasury is further required to "take into consideration" several factors,
including the "plan for the orderly resumption of private market funding or capital market
access," and the "need to maintain [the] status [of Fannie and Freddie] as . . . private
shareholder-owned compan[ies]." *Id.* §§ 1455(*l*)(1)(C); 1719(g)(1)(C).

156.    These statutory criteria plainly apply to any and all "amendments" of the Purchase
Agreements. Were it otherwise, Treasury could fundamentally alter its investments in the
Companies at any time, including after its investment authority has expired and effectively turn
Treasury's limited, temporary grant of authority to purchase the Companies' securities under
certain conditions, into an unconstrained and permanent authority and subvert the statutory
limitations imposed by Congress.

157.    There is no evidence in the public record that Treasury made the required
determinations or considered the necessary factors before imposing the Net Worth Sweep.
Indeed, the available evidence reveals that none of the necessary conditions was satisfied.
Further, Treasury also has not explained whether it considered alternatives to the Net Worth
Sweep that would have been both consistent with its statutory obligations and less harmful to
Plaintiff and other private shareholders. Treasury has thus arbitrarily and capriciously failed to
provide a reasoned explanation for its conduct, which results in the Government's expropriation
of all private shareholder value in the Companies' stock.

Protected Information to Be Disclosed Only in Accordance With Protective Order

158.    Treasury also arbitrarily and capriciously failed to consider alternatives to the Net Worth Sweep that would have better promoted stability in the mortgage markets by leaving the Companies on a sound financial footing. There is no evidence in the public record that Treasury considered alternatives to the Net Worth Sweep that would have provided greater assurance to investors that the Companies will be able to service their debts in the future.

159.    Treasury also acted in an arbitrary and capricious manner by failing to consider whether the Net Worth Sweep is consistent with its fiduciary duties to minority shareholders as the Companies' dominant shareholder.

160.    Treasury also acted arbitrarily and capriciously by relying on outdated and demonstrably inaccurate projections of Fannie's and Freddie's future financial performance while ignoring or failing adequately to account for more timely and accurate information on that subject.

161.    Under applicable state law governing shareholders' relationship with Fannie and with Freddie, a corporation's dominant shareholders owe fiduciary duties to minority shareholders.

162.    Treasury is the dominant shareholder and de facto controlling entity of the Companies. For example, Treasury serves as the Companies' only permitted source of capital, and Treasury must give permission to the Companies before they can issue other equity securities and before they can sell assets valued above $250 million. Treasury also is able to influence or control the actions of FHFA as conservator and the length and nature of the conservatorship.

163.    The Net Worth Sweep effectively transfers the value of other classes of Fannie and Freddie stock from Plaintiff and other private holders to the Companies' dominant

68

Protected Information to Be Disclosed Only in Accordance With Protective Order

shareholder. And as Treasury admits, the Net Worth Sweep's express purpose is to wind down the Companies' operations. Treasury's actions in preventing Plaintiff and other minority shareholders from receiving any dividends or value from their stock, combined with Treasury's intent to wind down the Companies, render the private stock devoid of any value or prospect of return.

164.    Treasury's conduct was therefore arbitrary and capricious, and Plaintiff is therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A).

## PRAYER FOR RELIEF

165.    WHEREFORE, Plaintiff prays for an order and judgment:

a.    Declaring that the Net Worth Sweep, and its adoption, are not in accordance with and violate HERA within the meaning of 5 U.S.C. § 706(2)(C), and that Treasury acted arbitrarily and capriciously within the meaning of 5 U.S.C. § 706(2)(A) by executing the Net Worth Sweep;

b.    Enjoining Treasury and its officers, employees, and agents to return to Fannie and Freddie all dividend payments made pursuant to the Net Worth Sweep or, alternatively, recharacterizing such payments as a pay down of the liquidation preference and a corresponding redemption of Treasury's Government Stock rather than mere dividends;

c.    Vacating and setting aside the Net Worth Sweep, including its provision sweeping all of the Companies' net worth to Treasury every quarter;

d.    Enjoining FHFA and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Net Worth Sweep;

Protected Information to Be Disclosed Only in Accordance With Protective Order

e.      Enjoining Treasury and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Net Worth Sweep;

f.      Enjoining FHFA and its officers, employees, and agents from acting at the instruction of Treasury or any other agency of the government and from re-interpreting the duties of FHFA as conservator under HERA;

g.      Awarding Plaintiff her reasonable costs, including attorneys' fees, incurred in bringing this action; and

h.      Granting such other and further relief as this Court deems just and proper.


Respectfully submitted,

s/ Robert B. Craig
Robert B. Craig
TAFT STETTINIUS & HOLLISTER LLP
1717 Dixie Highway
Suite 910
Covington, KY 41011-2799
(859) 547-4300
(513) 381-6613 (fax)
craigr@taftlaw.com

*Counsel for Plaintiff*

70

Protected Information to Be Disclosed Only in Accordance With Protective Order